[No. 43163. En Banc. January 9, 1975.]

ARNE M. GRIMSBY, *Appellant,* v. WERNER E. SAMSON *et al, Respondents.*

*Daniel F. Sullivan & Associates* and *Daniel F. Sullivan* and *Joan Smith Lawrence,* for appellant.

*Williams, Lanza, Kastner & Gibbs* and *Fred M. Zeder* and *Henry Kastner,* for respondent Samson.

*Lycette, Diamond & Sylvester,* by *Earle W. Zinn* and *John Petrie,* for respondent Ballard Community Hospital.

STAFFORD, J.—This is an appeal from the dismissal of a complaint for failure to state a claim.

Appellant Arne M. Grimsby (plaintiff) filed a claim for damages based upon the "tort of outrage" said to have arisen out of his wife's death. Decedent's physician, Dr. Werner E. Samson, and the Ballard Community Hospital, where decedent met her death, were named as defendants.

Plaintiff alleged he was the husband of the decedent and that a patient-physician relationship existed between Dr. Samson and the deceased. He asserted further that the doctor negligently, recklessly, wantonly and *outrageously* breached that relationship by abandoning her and failing to provide her with medical care. Plaintiff pleaded further that as a direct and proximate result thereof he "was required to witness the terrifying agony and explicit pain and suffering of his wife while she proceeded to die right in front of his eyes . . . thereby proximately *causing severe damage to [plaintiff including] . . . mental anguish and pain and suffering . . . and which has fur-*

*ther resulted in physical injury* and deterioration in . . . plaintiff, and that . . . plaintiff has been damaged . . . both *emotionally and physically* . . ." (Italics ours.)

Concerning the defendant hospital, plaintiff alleged he was the husband of the deceased and that a patient-hospital relationship existed between it and his wife. Similarly, the hospital is alleged to have negligently, recklessly, and wantonly breached its duty to provide required medical care and services to the deceased despite plaintiff's requests therefor. Plaintiff alleges "that as a direct and proximate result of said *outrageous conduct* [he] had inflicted upon him the most severe and damaging *emotional and physical distress and anguish* . . ." (Italics ours.)

A separate claim for wrongful death was instituted against both defendants. That action is not before us, however, and we express no opinion thereon.

Defendants moved separately for orders of dismissal contending plaintiff had failed to state a claim for which relief could be granted. In each case the motion was granted and the claim was dismissed with prejudice. Plaintiff appeals.

At the outset, defendants have moved to dismiss the appeal and affirm the trial court's judgment of dismissal with prejudice. They point out that plaintiff failed to file a statement of facts as required by ROA I-34 and ROA I-37. Thus, they assert, the trial court's judgments in favor of defendants must be affirmed *without reaching the merits* because this court has no statement of facts on which to base review, and it is presumed in such a case that the trial court's judgments were proper in law and in fact. *Kataisto v. Low,* 73 Wn.2d 341, 438 P.2d 623 (1968) is cited in support.

Our review of the record compels us to deny defendants' motion. *Kataisto* was concerned with a defendant's motion for *summary judgment* made pursuant to CR 56. On the other hand, the instant motions were made pursuant to CR 12(b)(6), based upon defendants' motions for dismissal stemming from an asserted *failure to state a claim* for

which relief could be granted. Thus, we are here concerned with CR 12(b)(6) rather than CR 56. As such, the compelling reasons for the necessity of a statement of facts set forth in *Kataisto* are not present in the issues raised by the instant motions and resultant orders.

 Although affidavits were apparently filed in connection with defendants' motions to dismiss for failure to state a claim, there is no indication of how or whether they were considered in determining the ultimate order issued by the trial judge. Thus, the order entered will be accepted at face value as one having been granted for failure to state a claim for which relief could be granted. CR 12(b)(6). Consequently, the only question before us, and the only issue actually before the trial judge, is whether it can be said that there is no state of facts which plaintiff could prove entitling him to relief under his claim. *Barnum v. State*, 72 Wn.2d 928, 435 P.2d 678 (1967). The factual allegations of the complaint must be accepted as true for the purpose of the motion. *Hofto v. Blumer*, 74 Wn.2d 321, 444 P.2d 657 (1968).

 Plaintiff has two basic theories, either of which he contends support his claim for relief. The first is based upon the rationale of *Dillon v. Legg*, 68 Cal. 2d 728, 441 P.2d 912 (1968). In *Dillon* a mother, whose child was struck by defendant's vehicle, was not within the traditional "zone of danger" at the time of the incident. She did, however, see the car strike the child as it was allegedly being driven by defendant in a negligent manner. The mother suffered a severe emotional disturbance. The California Supreme Court recognized that injury, standing alone, imposes no liability. Nevertheless, it found that a duty existed and recognized the right of the mother (a third party) to recover, apparently based upon a theory that liability to such third person (*i.e.*, the mother) would exist if a defendant should have foreseen that a mother would be in the vicinity of her child and would be disturbed by an injury to her child. In discussing the subject of "foreseeability" and consequent "duty" the California

court stressed (1) the mother's close proximity to the scene of the accident; (2) the shock having resulted from a direct emotional impact upon her from the sensory and contemporaneous observance of the accident, as contrasted with learning of it from others after its occurrence; and (3) the close mother-child relationship. The court also limited its holding to the case in which a "plaintiff suffered a shock which resulted in physical injury . . ." *Dillon v. Legg, supra* at 740.

A majority of courts that have recently considered the question have rejected the *Dillon* rationale. *Jelley v. La-Flame*, 108 N.H. 471, 238 A.2d 728 (1968); *Tobin v. Grossman*, 24 N.Y.2d 609, 249 N.E.2d 419 (1969); *Whetham v. Bismarck Hosp.*, 197 N.W.2d 678 (N.D. 1972); *see also Niederman v. Brodsky,* 436 Pa. 401, 261 A.2d 84 (1970); *Rodrigues v. State,* 52 Hawaii 156, 472 P.2d 509 (1970). The clear exception seems to be *Toms v. McConnell,* 45 Mich. App. 647, 207 N.W.2d 140 (1973). In *Tobin* the New York Supreme Court said, at page 615:

> The impact on a mother of a serious injury to her child . . . is . . . evident. . . . Unlike the factors which have brought about most expanding tort concepts, here there are no new technological, economic, or social developments which have changed social and economic relationships and therefore no impetus for a corresponding legal recognition of such changes. *Hence, a radical change in policy is required before one may recognize a cause of action in this case.*

(Italics ours.) The *Tobin* court continued at page 616:

> The problem of unlimited liability is suggested by the unforeseeable consequence of extending recovery for harm to others than those directly involved in the accident. *If foreseeability be the sole test, then once liability is extended the logic of the principle would not and could not remain confined.* It would extend to older children, fathers, grandparents, relatives, or others *in loco parentis*, and even to sensitive caretakers, or even any other affected bystanders.

(Italics ours.)

The court then went on to say, predicting the future of *Dillon*, at page 617:

> *Any rule based solely on eyewitnessing the accident could stand only until the first case comes along in which the parent is in the immediate vicinity but did not see the accident.* . . . Again the logical difficulty of excluding the grandparent, the relatives, or others *in loco parentis*, and even the conscientious and sensitive caretaker, from a right to recover, if in fact the accident had the grave consequences claimed, raises subtle and elusive hazards in devising a sound rule in this field.

(Italics ours.)

As predicted in *Tobin*, the California courts quickly extended the rationale of *Dillon* to a parent who had *not* witnessed the accident. The year following *Dillon*, a mother was allowed recovery although *she did not actually witness* her child's accident. She came upon the scene moments after the accident occurred. *Archibald v. Braverman*, 275 Cal. App. 2d 253, 79 Cal. Rptr. 723 (1969). Thus, within a short period of time, the element of foreseeability was broadened and extended and with it the nature of the duty owed to third parties. As observed in *Tobin*, even assuming there are cogent reasons for extending liability in favor of victims of shock resulting from injury to others, there appears to be no rational way to restrict the scope of liability even as attempted by *Dillon*'s three limiting standards. None are of much help if they are expected to serve the purpose of holding a strict rein on liability if the test is to be "reasonably objective."

We have reviewed the foregoing cases and feel the New York court's critical analysis of *Dillon* is well considered. We, too, follow the majority view and reject the *Dillon* concept.

Having rejected *Dillon* we turn to appellant's second theory. He argues that while a defendant might not be accountable for mere negligent actions which cause emotional stress, one, who by extreme and *outrageous* conduct, *intentionally* or *recklessly* directed at a third person, causes

severe emotional distress to a member of such person's immediate family, should be liable if the person so affected is present at the time. He cites Restatement (Second) of Torts § 46(2).

As a general rule, we have denied recovery for mental anguish and distress in cases not involving malice or wrongful intent, unless there has been an actual invasion of a plaintiff's person or security, or a direct possibility thereof. *Smith v. Rodene*, 69 Wn.2d 482, 418 P.2d 741 (1966); *Murphy v. Tacoma*, 60 Wn.2d 603, 374 P.2d 976 (1962). However, in *Schurk v. Christensen*, 80 Wn.2d 652, 497 P.2d 937 (1972), we indicated our willingness to reexamine this rule and the policy considerations which underlie it. Two major considerations generally referred to are: (1) the likelihood that courts will be flooded by fraudulent claims and (2) the defendant's potentially unlimited liability for every type of mental disturbance. *Schurk v. Christensen, supra; Rodrigues v. State, supra.*

In the past, the fear of fraudulent claims has not deterred us from removing common-law disabilities. As we stated in *Borst v. Borst*, 41 Wn.2d 642, 653-54, 251 P.2d 149 (1952):

> The courts may and should take cognizance of fraud and collusion when found to exist in a particular case. However, the fact that there may be greater opportunity for fraud or collusion in one class of cases than another does not warrant courts of law in closing the door to all cases of that class. Courts must depend upon the efficacy of the judicial processes to ferret out the meritorious from the fraudulent in particular cases. . . . If those processes prove inadequate, the problem becomes one for the legislature. . . . Courts will not immunize tort feasors from liability in a whole class of cases because of the possibility of fraud, but will depend upon the legislature to deal with the problem as a question of public policy.

The same reasoning is applicable in the case at hand. The argument of possible fraud in suits for mental distress "presupposes that courts are so ineffectual and the jury

system is so imperfect that fraudulent claims cannot be distinguished from the legitimate." We do not subscribe to this pessimistic premise. *Goode v. Martinis*, 58 Wn.2d 229, 234, 361 P.2d 941 (1961).

██ The second argument, that a defendant will have potentially unlimited liability for every type of mental disturbance, is, we feel, adequately met by the standards set forth in the comments to Restatement (Second) of Torts § 46. First, the emotional distress must be inflicted *intentionally or recklessly*; mere negligence is not enough. Second, the conduct of the defendant must be *outrageous and extreme*. As indicated by comment *d*, it is not enough that a "defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Liability exists "only where the conduct has been *so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.*" (Italics ours.) Comment *d* further points out that liability in the tort of outrage "does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities." In this area plaintiffs must necessarily be hardened to a certain degree of rough language, unkindness and lack of consideration. Clearly a case-by-case approach will be necessary to define the precise limits of such conduct. Nevertheless, among the factors a jury or court should consider are the position occupied by the defendant (comment *e*), whether plaintiff was peculiarly susceptible to emotional distress and defendant's knowledge of this fact (comment *f*), and whether defendant's conduct may have been privileged under the circumstances (comment *g*).

Third, the conduct must result in *severe emotional distress* to the plaintiff (comment *j*). Resulting bodily harm would, of course, be an indication of severe emotional distress, but a showing of bodily harm is not necessary.

Fourth, the plaintiff must be an *immediate family member* of the person who is the object of the defendant's actions, and he must be *present at the time of such conduct* (comment *l*).

Turning to plaintiff's complaint, we find that it states a cause of action under § 46(2)(a). It is alleged that defendants' conduct was reckless and wanton; that it was *outrageous* in that plaintiff "was *required to witness* the terrifying agony and explicit pain and suffering of his wife while she *proceeded to die right in front of his eyes* and at all times remaining helpless because of his inability to secure any medical care or treatment for his wife at all . . ." Finally, this conduct on the part of the defendants is alleged to have *caused plaintiff severe mental anguish which has resulted in physical injury.*

While we adopt the theory of Restatement (Second) of Torts § 46(1), (2) and (2)(a), the issues raised by subsection (2)(b) are not before us and we do not pass upon them.

The order of dismissal is reversed and the case remanded to the trial court for further proceedings.

ROSELLINI, HAMILTON, and BRACHTENBACH, JJ., concur.
FINLEY, J., concurs in the result.

UTTER, J. (concurring)—I concur with the majority. I do not, however, join in its unnecessary rejection of the rule of *Dillon v. Legg*, 68 Cal. 2d 728, 441 P.2d 912 (1968). Since we hold that appellant is able to recover on a theory of the tort of outrage, and thus that his complaint does state a cause of action, we need not and should not comment on the *Dillon* rule in this case.

Were the *Dillon* rule necessarily at issue in this case, I would follow it. The reasons for rejecting it seem to me to echo those advanced for refusing to allow recovery for the tort of outrage. As the majority finds, neither are persuasive considering the established ability of trial courts to define causation and foreseeability on a case-by-case basis.

The Supreme Court of Hawaii has recently recognized the vitality of the *Dillon* rule and applied and extended it in a case where a 10-year-old boy allegedly suffered severe mental distress when he witnessed the death of his step-grandmother who was struck by a car in a crosswalk. *Leong v. Takasaki*, ............ Hawaii ............, 520 P.2d 758 (1974). As the court there noted, courts in Rhode Island, Virginia and Michigan have also recently followed California's lead. *D'Ambra v. United States*, 354 F. Supp. 810 (D.R.I. 1973), *modified on other grounds*, 481 F.2d 14 (1st Cir. 1973); *Hughes v. Moore*, 214 Va. 27, 34, 197 S.E.2d 214, 219 (1973); *Toms v. McConnell*, 45 Mich. App. 647, 657, 207 N.W.2d 140 (1973).

WRIGHT, J. (dissenting)—I dissent. The tort of "outrage" has never been known in the law in this state. Plaintiff, appellant herein, was represented by extremely competent and experienced counsel. Appellant, however, could show little, if any, authority for the creation of a new tort to be known as the tort of "outrage."

The Restatement (Second) of Torts § 46 (1965) is cited. It should be noted, however, that every one of the examples following section 46 related to active conduct of the alleged tort-feasor. The case now before the court relates, at most, to passive conduct.

Appellant further relies upon an Oregon case, *Rockhill v. Pollard*, 259 Ore. 54, 485 P.2d 28 (1971) which quotes section 46 of Restatement (Second) of Torts, *supra*. The facts of that case are entirely different from the case now before the court. Therein a child was taken to defendant physician's office after an automobile accident. The child was unconscious. Although the physician first declined to examine the child, he finally did undertake a perfunctory examination. During that time the child vomited. The child, in fact, had a skull fracture which defendant physician did not find. The defendant physician was alleged to have been extremely rude, and finally ordered plaintiff out of his office into subfreezing temperatures. Despite the substantial

differences between that case and the matter now before the court, the Oregon court said at page 64: "This is a close case." The Oregon case, if not unique, is nearly so. It represents the outer limits to which the law has gone in such matters. It does not, however, go nearly to the unprecedented extreme to which appellant would have us journey in this case.

The California cases cited by appellant, *Dillon v. Legg*, 68 Cal. 2d 728, 69 Cal. Rptr. 72, 441 P.2d 912 (1968) and *Archibald v. Braverman*, 275 Cal. App. 2d 253, 79 Cal. Rptr. 723 (1969), both involved active negligence of the defendant. Those cases do not represent a majority rule, have been severely criticized, and are not authority in the instant case.

*Schurk v. Christensen*, 80 Wn.2d 652, 497 P.2d 937 (1972), was a case in which there was active misconduct, by one defendant, against whom action was permitted. The other defendants were guilty of only passive misconduct, and a summary judgment of dismissal as to them was affirmed. That case is substantially different from the matter now before the court, but it does recognize the distinction between the active and the passive tort-feasor in relation to claims for emotional distress and mental anguish.

In a number of Washington cases there has been a refusal to award damages for emotional distress. *Smith v. Rodene*, 69 Wn.2d 482, 418 P.2d 741 (1966); *Murphy v. Tacoma*, 60 Wn.2d 603, 374 P.2d 976 (1962). Each of those cases, and cases cited therein, were situations wherein there was no intentional or malicious act and no direct injury to the person of the plaintiff. *Smith v. Rodene*, *supra*, is particularly in point as that is a case wherein recovery was denied to a husband for physical injury resulting from "anxiety and concern for his spouse's condition." In *Smith*, we said in part at page 488:

> We have consistently held that, as a general rule, recovery may not be had for mental anguish or distress of mind in those cases not involving malice or wrongful intent unless there has been an actual invasion of the

plaintiff's person or security or a direct possibility thereof. See *Murphy v. Tacoma*, 60 Wn.2d 603, 374 P.2d 976 (1962), and cases cited therein.

Another and powerful reason exists for affirming the order of dismissal. This permits a double recovery. As conceded by appellant and by the majority, an action for wrongful death is pending.

RCW 4.20.020, after providing for an action for wrongful death for the benefit of, *inter alia*, a wife or husband, contains this language: "In every such action the jury may give such damages as, under all circumstances of the case, may to them seem just." In *Davis v. North Coast Transp. Co.*, 160 Wash. 576, 295 Pac. 921 (1931), it was held at page 583 an instruction "submitting to the jury, as an element of damages for which recovery could be had, the loss of 'the society, protection and companionship of her deceased husband.' " was a proper instruction.

Appellant cites *Wilson v. Lund*, 80 Wn.2d 91, 491 P.2d 1287 (1971). It should be emphatically noted, *Wilson* was a wrongful death case wherein recovery was permitted for grief and mental anguish. While *Wilson* was in part based on the statute relative to the parent-child relationship, it was also in part based upon case law. If *Wilson* is applicable to the matter before the court in any way, it is to demonstrate that a double recovery herein is not a mere possibility. It is a probability, if not a certainty, if both actions may be maintained.

It matters not that one action, the one presently before the court, is by the husband in his own right, while the other, the wrongful death action, is by the husband as administrator for the benefit of himself. Any attempt to differentiate between the two actions may result in many words, and many fine-spun theories, but all of the words and all of the theories will vanish as chaff before a windstorm in the face of the stark reality: the same person is seeking recovery for the same damage in two different actions.

64

For the reasons stated, I would affirm the judgment of dismissal.

HALE, C.J., and HUNTER, J., concur with WRIGHT, J.