[No. 14742-4-II.   Division Two.   March 8, 1994.]

JOHN KEATES, *Appellant,* v. THE CITY OF VANCOUVER, ET AL, *Respondents.*

---

[5]*See* RCW 9.94A.030(34) which includes second degree robbery in the definition of "violent offense".

ALEXANDER, J., dissents by separate opinion.

*Paul L. Henderson* and *Baumgartner & Henderson,* for appellant.

*Jerry F. King, City Attorney,* and *Theodore H. Gathe* and *Alison J. Chinn, Assistants,* for respondents.

PETRICH, J.* — John Keates sued the City of Vancouver and police officer Danne Johnson for the torts of outrage

---

*Judge John A. Petrich was a member of the Court of Appeals at the time oral argument was heard on this matter. He is now serving as a judge pro tempore of the court pursuant to CAR 21(c).

and negligent infliction of emotional distress committed against him when police interrogated him about his wife's murder. The trial court dismissed these claims on summary judgment.

In the early evening of January 13, 1986, John Keates returned home from work to find Karen, his wife, lying on their bed in a pool of blood. She had been raped, strangled, and shot with a shotgun. He called 911. The Vancouver Police Department sent Sergeant Danne Johnson to investigate, who took a statement from Keates.

Between January 14 and January 24, various department officials contacted Keates. They questioned him about his activities near or about the time of his wife's murder and he was also asked to submit hair, saliva, and blood samples for testing.

By January 24, the investigation had identified two suspects: Keates and James Dykgraaf. Dykgraaf was Keates's neighbor. The investigation revealed that Dykgraaf had a juvenile record for assaulting and attempting to rape a young girl in August 1976. The police also received an anonymous call from a male who told them that the "one" they "should be going after is Jim Dykgraaf". The caller also told them, and they later confirmed, that Dykgraaf owned a sawed-off shotgun. The police questioned Dykgraaf prior to January 24 and obtained samples of his blood, saliva, and hair, but did not expect the test results for several weeks.

Police suspected Keates because the crime scene showed no sign of forced entry, suggesting Karen knew her assailant. Also, a neighbor had reported seeing Keates run out of the house yelling, "What have I done! What have I done! My father, my mother, and now Karen". The police also discovered that Keates owned several weapons, including a shotgun, and Keates was unable to account for its location. Moreover, upon interviewing the Keateses' acquaintances, friends, and family, they learned that the Keateses had a strained marriage and learned that Keates

had once choked Karen and had given her black eyes, which she tried to hide with makeup.

Dykgraaf told the police that he had seen Keates's truck drive by the house at about the time of the murder. Although Keates had given them the name of a man who could account for his whereabouts on the afternoon of the murder, the police did not contact him.

Moreover, there were inconsistencies between the statement Keates gave on the day of the murder and the evidence at the scene. On January 24, Johnson asked Keates to come down to the police station to clear up these inconsistencies. Keates, accompanied by his uncle, a retired police officer from California, went voluntarily, arriving at about 4 o'clock in the afternoon.

When Keates arrived, he agreed to take a polygraph. The police read Keates his *Miranda*[1] rights, which he waived in writing. The polygraph examiner arrived at about 4:45 p.m. and began to examine Keates at about 5:15 or 5:30 p.m. Keates cannot remember how long the exam lasted. He does remember the examiner interviewed him in the polygraph room for at least an hour after the exam.

Because the results of the polygraph and the postexam interview were inconclusive, Keates agreed to allow Sergeants Johnson and Darryl Odegard to further interview him. The sergeants conducted a "good-guy, bad-guy" type interview, with Johnson playing the "bad guy" and asking most of the questions. During this interview, Johnson asked Keates about a report that someone had seen him in the neighborhood on the afternoon of his wife's murder. Although Keates had given them an alibi, they had not followed up on it. Johnson also questioned him about the garment he said he had seen on his wife's body, which police had been unable to locate, and questioned him about his shotgun, which had been missing since the murder. Johnson also told Keates he had interviewed a woman who feared that Keates had killed his wife and would now come after

---

[1] *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, 10 A.L.R.3d 974 (1966).

her. Johnson suggested to Keates that he murdered his wife and simply could not remember doing so. He also suggested the jury could be more lenient if he confessed. Johnson concluded the interrogation by putting his face up to Keates's and yelling, "I think you premeditatedly murdered your wife you f[******] a[******]." The interview ended when Keates asked to leave at about 11 or 12 that evening.

The police eventually developed probable cause to arrest Dykgraaf, who was eventually tried and convicted of the murder.

About 6 months after the murder, Keates developed chronic anxiety and depression, and began to have nightmares, dizziness, headaches, and chest pains. A psychiatrist and a clinical psychologist diagnosed him as suffering from delayed posttraumatic stress disorder, which they linked in part to the interrogation. Keates sued the City of Vancouver and Sergeant Johnson, claiming the Defendants failed to properly investigate his wife's murder and that this failure resulted in premature and overly aggressive interrogation, which caused his posttraumatic stress disorder.

The Defendants moved for summary judgment. Keates opposed the motion with the affidavit of Donald Van Blaricom, former chief of police for the City of Bellevue, Washington. Van Blaricom's opinion was that Dykgraaf was the only viable suspect. He also stated that Keates had no opportunity, and little motive or ability, to murder his wife. In Van Blaricom's opinion, the police officers acted with reckless indifference to the facts and were unconscionable in aggressively accusing John Keates of murdering his wife. Van Blaricom stated the "defendants' investigation of the murder of [Karen Keates] and their official treatment of [John Keates] were so lacking in the expected professional standard of care as to be callously outrageous".

The trial court granted the Defendants' motion. It also denied Keates's motion for reconsideration. Keates appeals. We affirm.

STANDARD OF REVIEW

■■ When reviewing a trial court's ruling on a motion for summary judgment, we review the record de novo. *Touchet Vly. Grain Growers, Inc. v. Opp & Seibold Gen. Constr., Inc.*, 119 Wn.2d 334, 341, 831 P.2d 724 (1992). We will uphold the trial court's judgment if "the pleadings, affidavits, depositions and admissions on file demonstrate that there is no genuine issue as to any material fact and the party bringing the motion is entitled to judgment as a matter of law." *DuVon v. Rockwell Int'l Corp.*, 116 Wn.2d 749, 753, 807 P.2d 876 (1991) (quoting *Christen v. Lee*, 113 Wn.2d 479, 488, 780 P.2d 1307 (1989)). "[T]here is no genuine issue of material fact or if reasonable minds could reach only one conclusion on that issue based upon the evidence construed in the light most favorable to the nonmoving party." *Weatherbee v. Gustafson*, 64 Wn. App. 128, 131, 822 P.2d 1257 (1992).

OUTRAGE

■■ To recover for emotional distress inflicted by intentional or reckless conduct, Washington plaintiffs must plead and prove the elements of the tort of outrage.

> The basic elements of the tort of outrage are: "(1) extreme and outrageous conduct; (2) intentional or reckless infliction of emotional distress; and (3) actual result to the plaintiff of severe emotional distress." *Rice v. Janovich*, 109 Wn.2d 48, 61, 742 P.2d 1230 (1987); Restatement (Second) of Torts § 46 (1965). The conduct in question must be *"so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Grimsby v. Samson*, 85 Wn.2d 52, 59, 530 P.2d 291 (1975).

*Dicomes v. State*, 113 Wn.2d 612, 630, 782 P.2d 1002 (1989). Whether conduct is sufficiently outrageous is ordinarily a question for the jury, but initially it is the responsibility of the court to determine if reasonable minds could differ on whether the conduct was so extreme as to result in liability. *Dicomes*, at 630; *Jackson v. Peoples Fed. Credit Union*, 25 Wn. App. 81, 84, 604 P.2d 1025 (1979) (trial court must make an initial determination as to whether the conduct

may reasonably be regarded as extreme and outrageous, thus warranting a factual determination by the jury).

In determining whether a case should go to jury, a court considers:

(a) the position occupied by the defendant; (b) whether plaintiff was peculiarly susceptible to emotional distress, and if defendant knew this fact; (c) whether defendant's conduct may have been privileged under the circumstances; (d) the degree of emotional distress caused by a party must be severe as opposed to constituting mere annoyance, inconvenience or the embarrassment which normally occur in a confrontation of the parties; and, (e) the actor must be aware that there is a high probability that his conduct will cause severe emotional distress and he must proceed in a conscious disregard of it.

*Phillips v. Hardwick*, 29 Wn. App. 382, 388, 628 P.2d 506 (1981) (paraphrasing *Jackson*, 25 Wn. App. at 86-87).

Accepting Keates's factual allegations as true, and drawing all reasonable inferences therefrom in his favor, we find the trial court was correct in dismissing Keates's claim of outrage on summary judgment.

Here, Johnson, acting on the behalf of the Defendant City of Vancouver, was lawfully engaged in the investigation of a serious crime. Keates clearly was a possible suspect. There was no showing that Johnson was aware or should have been aware that Keates was particularly susceptible to emotional distress or that Johnson consciously disregarded an obvious awareness that there was a high probability that his conduct would cause Keates to suffer severe emotional distress.

Keates admitted to knowing he was not under arrest and that he could have left at any time. He also admitted that Johnson terminated the interview the first time Keates asked to leave. Moreover, it is undisputed that no physical contact took place during the interview and that the only time anyone raised a voice was when Johnson yelled into Keates's face about murdering his wife. Although this conduct was insulting to Keates and unbecoming to an investigating officer, it does not rise to the level of outrage. The authorities had a duty to investigate Karen Keates's mur-

der, Keates was a viable suspect, and the police acted well within their authority in questioning him. We have no doubt that their aggressive questioning left Keates anxious and upset; but, when measured against an objective standard, we cannot say that their actions went "beyond all possible bounds of decency". (Italics omitted.) *Dicomes*, 113 Wn.2d at 630.

■ Van Blaricom's affidavit does not create a triable issue. The facts in his affidavit do not support a claim of "outrage". Van Blaricom's statement that the conduct was "callously outrageous" is a legal conclusion. Legal conclusions are disregarded for the purposes of a summary judgment motion. *Orion Corp. v. State*, 103 Wn.2d 441, 693 P.2d 1369 (1985).

### NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

Keates claims, in the alternative, that the same conduct constitutes negligent infliction of emotional distress. We disagree.

■ "The threshold determination in any negligence action is whether the defendant owed a duty of care to the plaintiff." *Johnson v. State*, 68 Wn. App. 294, 296, 841 P.2d 1254 (1992) (citing *Taylor v. Stevens Cy.*, 111 Wn.2d 159, 759 P.2d 447 (1988)). In *Hunsley v. Giard*, 87 Wn.2d 424, 553 P.2d 1096 (1976), the Washington Supreme Court articulated a broad and general duty not to inflict emotional distress. *Hunsley*, 87 Wn.2d at 435. It left to future courts the task of narrowing the potential scope of defendants by applying traditional negligence principles. *Hunsley*, 87 Wn.2d at 434-35.

■ Under traditional negligence principles, whether a particular class of defendants owes a duty to a particular class of plaintiffs is a question of law and depends on mixed considerations of "logic, common sense, justice, policy, and precedent". *Hartley v. State*, 103 Wn.2d 768, 779, 698 P.2d 77 (1985) (quoting *King v. Seattle*, 84 Wn.2d 239, 250, 525 P.2d 228 (1974)).

In deciding whether a duty is owed the primary consideration is whether the conduct in question is unreasonably dangerous. *Corrigal v. Ball & Dodd Funeral Home, Inc.*, 89 Wn.2d 959, 962, 577 P.2d 580 (1978); *Rose v. Nevitt*, 56 Wn.2d 882, 885, 355 P.2d 776 (1960); *State v. Goforth*, 33 Wn. App. 405, 655 P.2d 714 (1982). Unless the defendant's conduct is unreasonably dangerous, the defendant owes no duty. *Hunsley*, 87 Wn.2d at 435, 436. *See also Hansen v. Washington Natural Gas Co.*, 27 Wn. App. 127, 130, 615 P.2d 1351 (1980), *rev'd on other grounds*, 95 Wn.2d 773, 632 P.2d 504 (1981); *Rose*, 56 Wn.2d at 885. Conduct is unreasonably dangerous when the risks of harm outweigh the utility of the activity. *Wells v. Vancouver*, 77 Wn.2d 800, 810 n.3, 467 P.2d 292 (1970) (quoting *Raymond v. Paradise Unified Sch. Dist.*, 218 Cal. App. 2d 1, 31 Cal. Rptr. 847 (1963)).

The utility of the investigative conduct, including the infliction of emotional distress on the subject of an interrogation, vastly outweighs the risk of harm. "[I]t is to the best interest of society that those who offend against the law shall be promptly punished". Anyone "who has good reason to believe that the law has been violated shall have the right to take proper steps to cause the arrest of the offender". *Hanson v. Snohomish*, 121 Wn.2d 552, 557, 852 P.2d 295 (1993) (quoting *Peasley v. Puget Sound Tug & Barge Co.*, 13 Wn.2d 485, 496-97, 125 P.2d 681 (1942)).

The interrogation of criminal suspects serves the vital function in our society of apprehending dangerous criminals. David Crump, *Evaluating Independent Torts Based upon "Intentional" or "Negligent" Infliction of Emotional Distress: How Can We Keep the Baby from Dissolving in the Bath Water?* 34 Ariz. L. Rev. 439, 451 (1992); *Bromund v. Holt*, 24 Wis. 2d 336, 343, 129 N.W.2d 149, 153 (1964). Accusations and plea bargains are recognized to be an effective means of eliciting information that will aid in the apprehension of criminals. Crump, 34 Ariz L. Rev. at 451; *Bromund*.

In contrast, the risk of harm is slight. The trial court assesses the risk as it would affect a person of ordinary sensibilities. *Hunsley*, 87 Wn.2d at 436. The chance is slight

that persons of ordinary sensibilities would develop objective symptoms of emotional distress from an interrogation that can be terminated at will. The chance that any harm will be grave is even less. The person of ordinary sensibilities is expected to be "hardened to a certain degree of rough language, unkindness and lack of consideration". *Contreras v. Crown Zellerbach Corp.*, 88 Wn.2d 735, 740 n.2, 565 P.2d 1173 (1977) (quoting comments to Restatement (Second) of Torts § 46 (1965)). As one highly influential author on the subject of the tort of emotional distress observed: "a certain toughening of the mental hide is a better protection than the law could ever be." Calvert Magruder, *Mental and Emotional Disturbance in the Law of Torts*, 49 Harv. L. Rev. 1033, 1035 (1936). Although an officer's apparent authority over a criminal suspect creates a somewhat greater than normal risk of emotional distress, the suspect can neutralize the enhanced risk by terminating the interrogation.

Because the utility of the law enforcement function outweighs the criminal suspect's interest in freedom from emotional distress, "[t]he law . . . closely circumscribes the types of causes of action which may arise against those who participate in law-enforcement activity". *Bromund*, at 341. As a general rule, law enforcement activities are not reachable in negligence. *See Dever v. Fowler*, 63 Wn. App. 35, 44, 816 P.2d 1237, 824 P.2d 1237 (1991) (citing *Smith v. State*, 324 N.W.2d 299, 302 (Iowa 1982)), *review denied*, 118 Wn.2d 1028 (1992); *Drake v. State*, 126 Misc. 2d 309, 482 N.Y.S.2d 208 (Ct. Cl. 1984), *aff'd*, 496 N.Y.S.2d 382 (App. Div. 1985); *Boose v. Rochester*, 71 A.D.2d 59, 62, 421 N.Y.S.2d 740, 744 (1979). *See also Bromund*, at 344-46; *Wilson v. O'Neal*, 118 So. 2d 101, 105 (Fla. Dist. Ct. App.), *cert. dismissed*, 122 So. 2d 403 (Fla. 1960), *cert. denied*, 365 U.S. 850 (1961); *Johnson v. Pacifica*, 4 Cal. App. 3d 82, 86-87, 84 Cal. Rptr. 246, 249 (1970).

The great weight of authority holds that plaintiffs who seek redress for emotional distress caused by being accused of a crime must prove the elements of malicious prosecution. *Wilson; Pacifica; Smith; Drake; Rochester*. The strict require-

ments of proof of malice and lack of probable cause were developed to strike the appropriate balance between the public's right to have a criminal apprehended and the suspect's right to be free from injury. *Hanson,* 121 Wn.2d at 557; *Peasley,* 13 Wn.2d at 496-97; *Gem Trading Co. v. Cudahy Corp.,* 22 Wn. App. 278, 283, 588 P.2d 1222 (1978), *aff'd,* 92 Wn.2d 956, 603 P.2d 828 (1979). *Smith,* 324 N.W.2d at 301; *Bromund,* at 344-45; *Johnson,* at 87-88; *Montgomery Ward & Co. v. Pherson,* 129 Colo. 502, 508, 272 P.2d 643, 646 (1954); *Wilson,* 118 So. 2d at 105. The balance weighs against the suspect. *Gem Trading,* 22 Wn. App. at 284.

Our State "recognizes the central roles which police and prosecutors play in maintaining order in our society and the burdens imposed on each of us as citizens as part of the price for that order." *Hanson,* 121 Wn.2d at 568 (Utter, J., dissenting) (citing 1 Fowler Harper et al., *Torts* § 4.2, at 407-08 (2d ed. 1986)). Our state also recognizes that lawsuits against police officers tend to obstruct justice. *Hanson,* 121 Wn.2d at 557; *Peasley,* 13 Wn.2d at 496. Recognizing this tendency, our Legislature has attempted to discourage lawsuits by enacting RCW 4.24.350, which allows law enforcement officers to counterclaim against those who institute malicious prosecution actions against them. In enacting this statute the Legislature stated:

> The legislature finds that a growing number of unfounded lawsuits, claims, and liens are filed against law enforcement officers, prosecuting authorities, and judges, and against their property, having the purpose and effect of deterring those officers in the exercise of their discretion and inhibiting the performance of their public duties.
>
> The legislature also finds that the cost of defending against such unfounded suits, claims and liens is severely burdensome to such officers, and also to the state and the various cities and counties of the state. The purpose of section 2 of this 1984 act is to provide a remedy to those public officers and to the public.

Laws of 1984, ch. 133, § 1. Our judiciary also has a policy of discouraging these kinds of lawsuits. *Hanson,* 121 Wn.2d at 557; *Peasley,* 13 Wn.2d at 496.

We would distort the balance between society and the individual if we were to allow plaintiffs to bypass the threshold requirement of malicious prosecution in bringing a cause of action for negligent infliction of emotional distress. This would have a chilling effect on police investigation and would give rise to potentially unlimited liability for any type of police activity. *Dever*, at 44-45; *Boose*, at 62.

We hold, therefore, that police officers owe no duty to use reasonable care to avoid inadvertent infliction of emotional distress on the subjects of criminal investigations. This does not mean that plaintiffs may not obtain emotional distress damages as compensation for the officer's breach of some other duty.

This holding is not in conflict with *Garnett v. Bellevue*, 59 Wn. App. 281, 796 P.2d 782 (1990), *review denied*, 116 Wn.2d 1028 (1991). In *Garnett*, two Bellevue police officers responded to a lounge manager's complaint that two women in a hotel lounge were soliciting prostitution and had refused to leave. The officers separated the women and briefly detained them, during which time one officer verbally abused Garnett by calling her a prostitute and a hooker and telling her he would arrest her if he saw her in Bellevue again. The jury awarded Garnett damages for negligent infliction of emotional distress.

Keates's reliance on *Garnett* for the proposition that a duty arises upon direct contact between the police and the plaintiff is misplaced. The sole issue in *Garnett* was whether the public duty doctrine immunized the police officers from liability in negligence. The court held it did not, reasoning that the officers' direct contact with the two women established a "special relationship", which allowed them to sue the officers under the "special relationship" exception to the public duty doctrine.

Our courts have, heretofore, required plaintiffs to pass a 3-pronged test to qualify under this exception. The plaintiffs must show:

(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the

general public, and (2) there are express assurances given by a public official, which (3) give rise to justifiable reliance on the part of the plaintiff.

*Honcoop v. State*, 111 Wn.2d 182, 192, 759 P.2d 1188 (1988). *See also Taylor*, 111 Wn.2d at 166; *Chambers-Castanes v. King Cy.*, 100 Wn.2d 275, 669 P.2d 451, 39 A.L.R.4th 671 (1983). In *Garnett*, the police gave the plaintiffs no express assurances. Thus, the plaintiffs would have failed the test had the court applied it. We need not decide whether the court correctly decided to abrogate sovereign immunity without satisfaction of all three prongs of the test. In any event, the same division of this court that authored *Garnett* ruled in a later case that in a claim for negligent investigation there was no special relationship giving rise to a duty to an arson suspect by a municipality's arson investigator where the suspect was eventually cleared of all charges. *Dever*, 63 Wn. App. at 46.

In the context of the public duty doctrine, a "special relationship" does not give rise to a duty unless the plaintiff satisfies the traditional 3-pronged "special relationship" test. Here the defendants gave Keates no express assurances. Absent such a showing, Keates failed to demonstrate that the "special relationship" exception applied to his case.

We affirm.

MORGAN, C.J., concurs.

ALEXANDER, J. (dissenting in part) — I respectfully dissent from the majority opinion. I do so because I believe that the question of whether or not the conduct of the Vancouver police officers in questioning Keates was outrageous is a question for the jury. It, therefore, should not have been decided by the trial court on summary judgment. It may very well be that Keates will not prevail at trial on his outrage claim; nevertheless, it is a stretch to say, as the majority does here, that even after accepting Keates's allegation as true and drawing all reasonable inferences in his

favor, reasonable minds could only conclude that the police officer's conduct was not outrageous.

I also disagree with the majority's conclusion that former police chief Van Blaricom's affidavit does not contribute to a determination that there is a triable issue of fact here. As an expert witness with specialized knowledge, Van Blaricom's opinion that the treatment of Keates was "so lacking in the expected professional standard of care as to be callously outrageous" would be helpful to the trier of fact. *See* ER 702. His statement is primarily an observation about facts and the trial court should have considered it along with the other evidence and concluded that there was a fact issue for trial. I would reverse the trial court's dismissal of the outrage claim and remand for trial on that claim.

Reconsideration denied April 21, 1994.

Review denied at 124 Wn.2d 1026 (1994).