# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| JOE WICKERSHAM and CARTER WICKERSHAM, | ) ) ) | No. 77651-7-I |
| Appellants, | ) ) | DIVISION ONE |
| v. | ) ) | UNPUBLISHED OPINION |
| STATE OF WASHINGTON, WENDY WILLETTE, | ) ) ) | |
| Respondents, | ) ) | |
| KING COUNTY and ROBERT NISHIMURA, | ) ) ) | |
| Defendants. | ) ) ) | FILED:  October 14, 2019 |

LEACH, J. — Joe and Carter Wickersham appeal the trial court's summary judgment dismissal of their lawsuit against Department of Fish and Wildlife officer Wendy Willette and the State of Washington.  Because the Wickershams do not establish issues of material fact about any of their claims, we affirm.

## FACTS

Viewing the record in the light most favorable to the Wickershams, it establishes the following facts.[1]

---

[1] The trial court did not make any findings of fact or conclusions of law.

In August 2010, Joe Wickersham lived in his house on Lake Desire with his 16-year-old son, Carter Wickersham. Joe is legally blind and has "just a very limited peripheral vision [in his] left eye, which is quite blurry."

On August 14, 2010, Wendy Willette, a detective with the Washington Department of Fish and Wildlife (DFW), was on general patrol near Renton, Washington, wearing her class B duty uniform. From the public access area of Lake Desire, she saw a woman fishing from a dock across the lake. She wanted to check on this person's fishing license. So she drove around the lake to the driveway she estimated would give her access to the dock. There were no cars in the driveway, and Willette parked about halfway down to the lake.

At this time, Joe was home alone, sunning himself on an upstairs deck. As he heard a car drive down his neighbor's driveway, his phone rang. His friend James E. Ranelli had called. They spoke for several minutes.

Willette got out of her parked car and walked until she could see the lake and the dock. She did not see anyone on the dock. But she did see a fishing pole. Willette did not talk to anyone in the house served by the driveway.

As Willette walked toward the dock, she saw a house that she associated with the dock, the Wickersham house. She walked to the back of this house, climbed stairs for two levels of the deck, and knocked on the back door. She

then walked down a level and "yelled as loudly as [she] could at the top window, 'Hello! Police! Pay Attention!'"

Joe was still on the phone with Ranelli when he heard Willette "start screaming . . . . Then [his] dog [Maggie] started barking, probably one second later." Willette screamed, "[G]et the fuck out here now!" Joe states that Maggie "never growled during this whole time, and was just a normal barking dog."

While Joe heard his dog barking, his impaired vision prevented him from seeing any interaction between Willette and Maggie. Willette described it this way:

> Seconds later, a very large Doberman Pinscher [wearing a shock collar] rounded the right corner of the house [from the front], at the top level and came down the deck stairs . . . and was running for me. It was growling, and it was snarling. . . . And I had time to yell out, "You better secure your"—and I couldn't get the last word out before the dog was lunging at me to attack me.

According to Joe, during this time, Willette's "[e]very other word was the F word." She yelled, "Get your F'ing ass—get the F out here; get your F'ing ass out here. . . . if you don't get your F'ing ass out here, I'm going to shoot your F'ing dog."

Willette had a Glock 45 semi-automatic pistol. When the dog was "2 feet at the most" from her, she fired at it. Joe heard a "pop, pop, pop" sound." He told Ranelli, "[O]h, my God, she's shot Maggie." The dog ran "back up to the front of the house, around the right-hand side." Willette "walked up the side of

-3-

the house on the right-hand side." She held her pistol out but pointed down because she "didn't know if the dog was going to continue to attempt to attack."

Joe walked downstairs, carrying a cordless phone. When he opened the door, Willette had her gun pointed at him. She told Joe to "drop it." He asked her if she was law enforcement. She said yes, and he dropped the phone on his foot. Willette said, "[G]et out here. Get out here. Sit down, sit down right there." Joe also heard a voice on Willette's radio say, "[C]anine down and one in custody." Joe asked if he was in custody. Willette told the dispatcher he was not. Joe sat down, and Willette put her gun away.

Willette screamed about a woman fishing on his dock. Joe replied that no one had been fishing from the dock and that she could go in his house and look for the person. She chose not to go in the house. During this time, the dog was inside bleeding. Willette said, "[Y]ou need to take care of your dog. Your dog is going to die." Joe told her he was blind and he could not see where the dog was shot. He also suggested calling for help and offered to go inside and get the phone. Willette would not let him. She asked if he had been drinking, and he said no.

Willette said she shot Maggie twice. Joe heard three shots. He claims that "[s]he demanded if [he] didn't agree that she shot twice . . . that she was going to take [him] to jail for obstruction." Joe refused to sign a statement.

-4-

Willette also said she "wasn't standing outside in over 90-degree heat to take [Joe's] shit, and if he was going to continue to hinder [her], then he was going to go to jail for obstruction." She admits that she used the words "shit" and "fuck" at this point when speaking to Joe.

Joe heard Carter returning, followed by King County Sheriff Deputy Robert Nishimura. Nishimura had responded to the dispatcher's call for backup. A state patrol trooper also arrived but did not go to the house. Instead, he made sure "everybody was under control at that point."

Carter "went into the house . . . got some towels . . . corralled Maggie and started cleaning up some of the blood." At the same time, Willette walked back to her truck and drove it closer to Joe's house. She took photographs of Maggie's injuries and the blood on the floor. As Willette took photographs, Nishimura talked to Joe.

The incident ended with Nishimura giving Carter directions to a veterinary hospital. Willette told Joe and Carter she would meet them there. Willette and Nishimura drove to the hospital but did not see Joe or Carter. Carter took Maggie to a different vet, who discharged the dog the same day after treating her wounds.

Procedure

In August 2013, the Wickershams sued Willette, the State of Washington, Nishimura, and King County in King County Superior Court. They asserted claims for trespass, conversion of chattels, assault, false arrest and imprisonment, outrage, negligent infliction of emotional distress, negligence, negligent training and supervision of Willett, and violation of their civil rights under 42 U.S.C. § 1983. King County and Nishimura removed the case to federal court.

The federal district court dismissed the claims of false imprisonment and false arrest with prejudice as barred by the statute of limitations. The court also dismissed the claims against Nishimura and King County.[2] And it dismissed on summary judgment the Wickershams' federal claim under § 1983 because qualified immunity shielded Willette. It declined to exercise supplemental jurisdiction over the remaining claims and remanded them to state court. The Ninth Circuit affirmed the district court's ruling.

On remand, the superior court dismissed the Wickershams' remaining claims on summary judgment. The Wickershams appeal.

_____

[2] Wickersham v. Washington, No. C13-01778-JCC (W.D. Wash. Jan. 15, 2015) (court order).

STANDARD OF REVIEW

This court reviews an order on summary judgment de novo.[3] We consider all facts and reasonable inferences in the light most favorable to the nonmoving party.[4] But conclusory facts presented by the nonmoving party will not defeat summary judgment.[5] Summary judgment by the trial court is proper if the record shows no genuine issue of material fact and the moving party is entitled judgment as a matter of law.[6]

ANALYSIS

As a preliminary matter, the State claims,

The Ninth Circuit's holding that the Wickershams "failed to show that Officer Willette was acting outside the scope of her authority under RCW 77.12.154 when she entered the property but did not see a woman fishing" is the law of the case. It must be followed for the remainder of the litigation."

But the State cites no authority supporting its assertion that a federal appellate court holding on an issue distinct from the issues before a state court

---

[3] Sabey v. Howard Johnson & Co., 101 Wn. App. 575, 581-82, 5 P.3d 730 (2000).

[4] Sabey, 101 Wn. App. at 582.

[5] Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 359-60, 753 P.2d 517 (1988) (citing Am. Linen Supply Co. v. Nursing Home Bldg. Corp., 15 Wn. App. 757, 767, 551 P.2d 1038 (1976)), abrogated on other grounds by Mikkelsen v. Pub. Util. District No. 1 of Kittitas County, 189 Wn.2d 516, 528, 532, 404 P.3d 464 (2017).

[6] CR 56(c); Sabey, 101 Wn. App. at 581-82.

controls the state court issues.[7] The Ninth Circuit did not decide whether, as a matter of law, Willette did not trespass, convert chattels, act outrageously or negligently, or negligently inflict emotional damages. So the Ninth Circuit's decision does not control these issues.

The Wickershams challenge the trial court's dismissal of the remanded state law claims against Willette and the State on summary judgment. They claim to have shown issues of material fact about whether Willette trespassed or committed outrage, negligence, negligent infliction of emotional distress, or conversion. We disagree.

## Trespass

The Wickershams assert that the record shows a genuine issue of material fact about whether Willette committed trespass.

RCW 77.12.154 gives DFW officers the authority to "enter upon any land . . . and remain there while performing their duties without liability for trespass."

---

[7] Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992) (declining to consider arguments unsupported by citation to authority). The case the State cites involves the law of the case doctrine as it applies between Washington Courts of Appeals, not between federal and state courts. Roberson v. Perez, 156 Wn.2d 33, 41, 44, 123 P.3d 844 (2005).

The Wickershams assert that Willette did not have authority to enter upon the Wickershams' land. But Willette's described activities fall within the duties of a DFW officer.

While on patrol, Willette "check[s] access areas to make sure that everyone has their vehicle-use permit; to make sure that if there's someone boating, they have all their required equipment; if someone is fishing, they have the licenses they're required to have." Willette also checks catch to determine if a person has caught too many fish or violated gear regulations.

After seeing a woman fishing from the dock, Willette attempted to contact her to check her license and follow up on catch and gear limitations. So she drove around to the other side of the lake. She had noted a Livingston-style boat upside down on the shore near the dock. She saw the same boat when she arrived at the dock.

Willette went up to the house she associated with the dock to continue investigating after she saw a fishing pole on the dock but no person. She knocked on windows and yelled in her attempt to contact someone to ask about the woman on the dock. When Maggie ran around the corner and leaped at her, Willette shot the dog, as she says she was trained to do when she perceived a threat to her life. She also contacted dispatch because she had discharged her

weapon. She kept her gun out because she was concerned Maggie might attack her again.

The Wickershams provide no evidence that supports their claim that Willette was not acting within the scope of her duties as a DFW officer. Instead, they provide conclusory statements to the effect that "Agent Willette pretty much went out on a wild goose chase" and assert facts unsupported by the record.[8] But they cannot rely on conclusory statements to defeat a summary judgment motion.

The Wickershams contend that RCW 77.15.080 defines the scope of a DFW officer's authority. RCW 77.15.080 authorizes DFW officers to stop a person and conduct an inspection if they have "articulable facts that a person is engaged in fishing." When Willette reached the dock, she saw no one fishing. So the Wickershams contend she could take no further action and had to leave. Because she continued her investigation, they claim she acted outside her authority as a WSF officer.

The Wickershams' argument ignores the statute which defines the general authority of a DFW officer, RCW 77.15.075(1): "Fish and wildlife officers shall have and exercise, throughout the state, such police powers and duties as are

---

[8] For example, "Agent Willette wrongly identified the property."

vested in sheriffs and peace officers generally. Fish and wildlife officers are general authority Washington peace officers."

Willette decided to investigate whether a person she saw fishing had the required license. This certainly falls within the general duty of a Washington peace officer. So RCW 77.12.154 authorized both her entry onto the Wickersham property and her effort to contact someone at the Wickersham house. The Wickershams did not create an issue of material fact about their trespass claim.

### Outrage

The Wickershams also claim that the record shows a genuine issue of material fact about their outrage claim.

To establish the tort of outrage or intentional infliction of emotion distress, a plaintiff must show (1) that the defendant's conduct was extreme and outrageous, (2) that she intentionally or recklessly inflicted emotional distress, and (3) that the plaintiff actually experienced severe emotional distress.[9] To be extreme and outrageous, conduct must go "beyond all possible bounds of decency, and [is] regarded as atrocious, and utterly intolerable in a civilized community."[10] In ruling on a motion for summary judgment, the trial court must

---

[9] Rice v. Janovich, 109 Wn.2d 48, 61, 742 P.2d 1230 (1987) (citing RESTATEMENT (SECOND) OF TORTS § 46 (AM. LAW INST. 1965); Grimsby v. Samson, 85 Wn.2d 52, 57-58, 530 P.2d 291 (1975)).
[10] Grimsby, 85 Wn.2d at 59 (quoting RESTATEMENT § 46 cmt. d).

make a threshold determination on whether reasonable minds could differ on whether the conduct was sufficiently extreme and outrageous to result in liability.[11]

The Wickershams provided no evidence to support their assertion that Willette's conduct was outrageous under the circumstances or that she intentionally or willfully provoked emotional distress in Joe.

Willette approached the rear of the Wickershams' house, knocked on the windows, and called out. Her conduct during her effort to contact someone at the house may have been quite unprofessional, but it did not go "'beyond all possible bounds of decency,'" nor could it be "'regarded as atrocious, and utterly intolerable in a civilized community.'"[12] Even if she was as profane and rude as the Wickershams described and even if Joe did not utter a single profanity throughout the interaction, the Wickershams cite no authority showing profanity alone is sufficient to support a cause of action for outrage.[13]

The Wickershams also ask the court to consider the shooting of Maggie and Willette pointing her gun at Joe as outrageous, but they provide no evidence to counter Willette's contention that she shot the dog because she feared she was being attacked or her contention that she kept her gun out because she

---

[11] Robel v. Roundup Corp., 148 Wn.2d 35, 51, 59 P.3d 611 (2002).

[12] Grimsby, 85 Wn.2d at 59 (quoting RESTATEMENT § 46 cmt. d).

[13] Where no authority is cited, this court will assume the party has found none. Cowiche Canyon Conservancy, 118 Wn.2d at 809.

feared another attack. And the Wickershams provide no evidence to suggest Willette continued to point her gun at Joe after she established he presented no threat.

We conclude that the Wickershams do not establish an issue of material fact on their outrage claim.

<u>Negligence and Negligent Infliction of Emotional Distress</u>

The Wickershams also claim that the record shows a genuine issue of material fact about whether Willette was negligent or negligently inflicted emotional distress on Joe.

The analysis of any negligence claim, including negligent infliction of emotional distress, begins with the threshold determination of whether the defendant owed the plaintiff a duty of care.[14] In this case, this court must examine the Wickershams' claims in the context of the public duty doctrine, which affects a public official's liability for alleged negligent conduct.[15] This doctrine requires that a plaintiff establish the public official, acting in her capacity as an officer, breached a duty owed to the plaintiff and not merely the public at large.[16] The doctrine has four exceptions that allow for liability, including the "special relationship" exception.[17]

---

[14] <u>Taylor v. Stevens County</u>, 111 Wn.2d 159, 163, 759 P.2d 447 (1988).
[15] <u>Cummins v. Lewis County</u>, 156 Wn.2d 844, 852, 133 P.3d 458 (2006).
[16] <u>Donohoe v. State</u>, 135 Wn. App. 824, 834, 142 P.3d 654 (2006).
[17] <u>Cummins</u>, 156 Wn.2d at 852.

No. 77651-7-I / 14

The Wickershams claim that the "special relationship" exception applies here. A "special relationship" exists if

"(1) there is direct contact or privity between the public official and the injured plaintiff which sets the latter apart from the general public, and (2) there are express assurances given by a public official, which (3) give[ ] rise to justifiable reliance on the part of the plaintiff."[18]

Contact alone does not support a special relationship.[19] Unless the facts support all three prongs, the public duty doctrine applies and the alleged claim fails.[20]

The Wickershams do not present evidence that Willette gave them assurance or that they relied on any assurance from her. So the Wickershams do not establish an exception to the public duty doctrine.

The Wickershams claim that Garnett v. City of Bellevue[21] supports their claim. In that case, a police officer's direct verbal abuse and threats fell under the "special relationship exception."[22] But in a later case, Keates v. City of Vancouver,[23] the court distinguished its application of the "special relationship" test from the analysis in Garnett and held explicitly that all three prongs of the

---

[18] Donohoe, 135 Wn. App. at 835 (alteration in original) (quoting Beal v. City of Seattle, 134 Wn.2d 769, 785, 954 P.2d 237 (1998)).

[19] Keates v. City of Vancouver, 73 Wn. App. 257, 269-70, 869 P.2d 88 (1994).

[20] Pettis v. State, 98 Wn. App. 553, 563-64, 990 P.2d 453 (1999); Keates, 73 Wn. App. at 270.

[21] 59 Wn. App. 281, 796 P.2d 782 (1990).

[22] Garnett, 59 Wn. App. at 286-87.

[23] 73 Wn. App. 257, 270, 869 P.2d 88 (1994).

test must be met for the exception to the special duty doctrine to apply.[24] This result follows the Washington Supreme Court's decisions holding that a plaintiff must satisfy all three prongs of the test to show a "special relationship" exception to the public duty doctrine exists.[25]

The Wickershams also assert Willette had a "duty to act reasonably and carefully," relying on Brutsche v. City of Kent[26] and State v. Seagull.[27] But these cases address trespass, not negligence, and do not aid the Wickershams.

Because the Wickershams do not establish an exception to the public duty doctrine, they do not show the existence of any issue of material fact about whether Willette owed them a duty of care supporting their negligence or negligent infliction of emotional distress claims.

---

[24] Keates, 73 Wn. App. at 270. The Keates court first stated, in reference to Garnett, "We need not decide whether the court correctly decided to abrogate sovereign immunity without satisfaction of all three prongs of the test." Keates, 73 Wn. App. at 270. It then held, "In the context of the public duty doctrine, a 'special relationship' does not give rise to a duty unless the plaintiff satisfies the traditional 3-pronged 'special relationship' test." Keates, 73 Wn. App. at 270. The court also distinguished Garnett from Dever v. Fowler, 63 Wn. App. 35, 46, 816 P.2d 1237 (1991) on the same basis. Keates, 73 Wn. App. at 270.

[25] See e.g., Cummins, 156 Wn.2d at 848 (refusing to find a "special relationship" between a medical dispatcher and a 911 caller when the dispatcher did not provide explicit assurance that she would send medical aid to the caller's address).

[26] 164 Wn. 2d 664, 673, 193 P.3d 110 (2008).

[27] 95 Wn.2d 898, 902, 632 P.2d 44 (1981).

Conversion of Chattels

The Wickershams assert that Willette committed conversion of chattels when she shot Maggie.

To establish a claim for conversion, a plaintiff must prove that the defendant willfully interfered with a chattel without lawful justification and deprived the plaintiff of possession of the chattel.[28]

The Wickershams do not establish that any defendant deprived them of possession of Maggie. They assert that she died as a result of the injuries inflicted by Willette. The record does not support this assertion. The veterinarian discharged Maggie the same day she treated Maggie's wounds. The veterinarian's report states that "[r]ecovery was uneventful." Maggie died in October. Between the shooting and her death, the Wickershams left town for several weeks. They did not obtain a necropsy. So the record contains no evidence of her cause of death.

The Wickershams did not show any issue of material fact about their conversion claim.

CONCLUSION

We affirm. The record shows no genuine issue of material fact about the Wickershams' trespass or the tort of outrage claims. The "special relationship"

---

[28] Olin v. Goehler, 39 Wn. App. 688, 693, 694 P.2d 1129 (1985) (citing Judkins v. Sadler-MacNeil, 61 Wn.2d 1, 3, 376 P.2d 837 (1962)).

-16-

exception to the public service doctrine does not apply to Willette's challenged acts or omissions. So the Wickershams do not establish an issue of material fact about any duty Willette owed them to support their negligence and negligent infliction of emotional distress claims. Finally, they did not provide evidence showing that Willette deprived them of possession of their dog. So they do not raise an issue of material fact about their conversion claim. In sum, they do not establish that the trial court erred when it dismissed their claims on summary judgment.

_Leach, J._

WE CONCUR:

_Smith, J._