**PENSION BENEFIT GUARANTY, CORPORATION, Plaintiff–Appellant,**

v.

**EAST DAYTON TOOL AND DIE COMPANY, et al., Defendants–Appellees.**

No. 93–3185.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 2, 1993.

Decided Jan. 24, 1994.

Rehearing and Suggestion for Rehearing En Banc Denied March 9, 1994.

Deborah West (argued), Jeffrey B. Cohen, Lois Bruckner Parks, Anna Y. Chytl (briefed), Carol Connor Flowe, Pension Ben. Guar. Corp., Office of Gen. Counsel, Washington, DC, for plaintiff-appellant.

Charles J. Faruki, D. Jeffrey Ireland, Paul Leonard Horstman (argued and briefed), Faruki, Gilliam & Ireland, Dayton, OH, for defendants-appellees.

Before: KEITH and NORRIS, Circuit Judges; and ZATKOFF, District Judge.*

KEITH, Circuit Judge.

Plaintiff/Appellant Pension Benefit Guaranty, Corp. ("PBGC") appeals the district court's judgment finding the Defendants/Appellees East Dayton Tool and Die Co., Inc. ("East Dayton"), et al., did not control East Dayton's pension plan on its termination date and therefore, were not liable for the pension plan's unfunded benefit liabilities, and its subsequent grant of individual Appellees' 12(b)(6) motion. For the reasons stated below, we **REVERSE** and **REMAND.**

### I.

In 1959, East Dayton, an Ohio corporation that designed, manufactured and sold tools and dies, established the East Dayton Tool & Die Restated Retirement Plan for Salaried Employees (the "Plan") which qualified for coverage under Title IV of the Employee Retirement Income Security Act ("ERISA"). Dorothy Darrow ("Darrow"), the daughter of

---

* The Honorable Lawrence P. Zatkoff, United States District Judge for the Eastern District of Michigan, sitting by designation.

East Dayton's founder, eventually inherited 100% of East Dayton stock.

On August 23, 1973, Darrow sold East Dayton's common shares for $1.35 million to Paul H. Granzow ("Granzow"), Charles F. Sherman ("Sherman"), Robert M. Tormey ("Tormey"), individual Appellees, and Clifton C. Hawkins, Jr. ("Hawkins").[1] The individual Appellees each purchased 30% of the stock and Hawkins purchased the remaining 10%. In return for the stock, individual Appellees gave Darrow $150,000 in cash and a $1.2 million promissory note secured by the voting rights of East Dayton stock and the right to compel the sale of East Dayton stock upon default. The shares of stock, although pledged to Darrow, were held in escrow by Third National. The loan documents provided upon default, Darrow could either compel the sale the stock or elect at least two directors to East Dayton's Board of Directors.[2]

At the time of stock acquisition, each individual Appellee owned one-third of the holding company Roscommon Financial Corporation ("Roscommon Financial"). In February 1974, the individual Appellees transferred their East Dayton stock to Roscommon Financial. Shortly thereafter, Roscommon Financial acquired Hawkins' stock and became East Dayton's sole shareholder.

On January 26, 1976, after operating East Dayton for two and half years, Roscommon Financial defaulted on Darrow's loan. Darrow refused to consent to a loan which would have allowed Roscommon Financial to continue business, and instead, pursuant to the options provided in the loan documents, appointed two directors to East Dayton's

Board. On February 7, 1976, the newly elected East Dayton Board decided to liquidate East Dayton and to repay Darrow with the proceeds. The individual Appellees did not approve of or participate in the decision to liquidate. At that time, because Darrow had control of the voting rights of the stock, Granzow offered to formally transfer the East Dayton stock from the escrow agent to Darrow. Darrow refused.

On April 26, 1976, East Dayton filed a Notice of Intent to Terminate the Plan with PBGC. After an investigation, PBGC notified East Dayton its Plan assets were insufficient by $326,362 to satisfy the benefits guaranteed by ERISA under Title IV. On April 27, 1976, East Dayton, with Granzow acting as President, and PBGC agreed to terminate the Plan, effective May 15, 1976, and to appoint PBGC the statutory trustee of the Plan. The parties agreed on the plan termination date, May 15, 1976, Roscommon Financial owned: (1) 100% of the East Dayton stock; (2) 88% of Dayton Casting Company stock; and (3) 90% of Advance Foundry Company stock. The parties also acknowledged the individual Appellees each owned ⅓ interest in the partnership Roscommon Realty.[3] PBGC, therefore, determined East Dayton, Roscommon Financial, Dayton Casting, Advance, Roscommon Realty and two other entities (later found not liable by PBGC) were members of the same control group as defined by 29 U.S.C. § 1301(b), and therefore, were jointly liable for the amount of $326,362.

On May 6, 1981, the Roscommon Group appealed PBGC's initial liability determina-

---

1. Hawkins was not sued in his individual capacity, and therefore he is not included in the collective reference to "individual Appellees."

2. The Escrow Agreement in pertinent part provided:

   2. So long as Company [East Dayton] shall well and truly pay the promissory note according to its terms and tenor, the said stock certificates shall be held by the Escrow Agent, and Shareholders shall continue to have all the rights of ownership, except possession and transfer rights.
   3. Upon written notice given to Escrow Agent by Darrow of default in the payment of any installment of interest or principal due accord-

ing to the terms of said promissory note, then Escrow Agent shall either (i) cause the shares to be sold as hereinafter set forth, or (ii) shall cause the immediate election to the Board of Directors of the Company, of not less than two persons chosen by Darrow or her executors or assigns; said directors to continue in office until the Company cures the default, or, in the event the default cannot be cured in the opinion of the two directors, then Escrow Agent shall [sell the stock]. . . .

3. Roscommon Financial, Roscommon Realty, East Dayton, Dayton Casting Company, Inc. Advance Foundry Company, Inc., and individual Appellees are collectively referred to as the Roscommon Group.

tion to PBGC's Appeals Board. On appeal, Roscommon Group argued they were not a control group for liability purposes because Roscommon Financial did not control East Dayton on the plan termination date. The Roscommon Group noted the loan documents, upon default, divested them of all authority and vested control in Darrow.

On April 28, 1982, the Appeals Board issued the agency's final determination finding the Roscommon Group was a member of a commonly controlled group on the plan termination date under § 4001(b) of ERISA. As such, the Roscommon Group qualified as an "employer" which maintained the Plan and was liable for the guaranteed benefits. The Appeals Board noted the Roscommon Group's tax returns indicated 100% ownership of East Dayton. This ownership entitled the Roscommon Group to $2 million in tax deductions. PBGC imposed liability upon the Roscommon Group but not upon the individual Appellees.

On May 13, 1982, PBGC sought enforcement of the agency's determination in the United States District Court for the Southern District of Ohio. On June 22, 1982, the Roscommon Group filed an Answer, Counterclaim and a Motion for Judgment on the Pleadings. Simultaneously, the individual Appellees filed a Motion to Dismiss PBGC's complaint. Because both motions relied on the evidence in the administrative record, both were treated as summary judgment motions and were denied.

On January 23, 1985, the district court referred the case to a magistrate. The magistrate, relying on the reasoning in *In re Challenge Stamping & Porcelain Co.*, 719 F.2d 146 (6th Cir.1983) (*"Challenge Stamping"*), concluded once Roscommon Financial defaulted, the loan documents effectively transferred control to Darrow prior to the termination date. The Roscommon Group was not an employer controlling East Dayton on the Plan's termination date, and therefore, was not liable for East Dayton's unfunded benefit liabilities. The district court adopted the magistrate's recommendation and entered judgment for the Appellees. The district court also granted individual Appellees' Rule 12(b)(6) Motion to Dismiss because

PBGC failed to state a cause of action with respect to them. This timely appeal followed.

## II.

On appeal, PBGC argues the district court incorrectly utilized a subjective test in blatant disregard for Congress' express intent that an objective test be used to identify trades or businesses under "common control" for purposes of 29 U.S.C. § 1301(b). Additionally, PBGC argues the district court erroneously granted the individual Appellees' Motion to Dismiss. Each allegation of error will be discussed below.

### A.

PBGC argues Congress expressly defined an employer for Title IV liability purposes as trades or businesses under common control with the pension plan sponsor. Further, Congress explicitly authorized PBGC to define trades and businesses under "common control" for the imposition of liability for the termination of underfunded pension plans. PBGC clearly defined "common control" as an ownership interest of 80% of the total combined voting classes or of the total value of all shares of all classes of stock connecting a group of trades and businesses ("80% control test"). Therefore, according to PBGC, the judiciary must apply PBGC's test unless the regulation is arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law. Thus, PBGC argues the district court erred in holding that *Challenge Stamping* was controlling precedent for this case. We agree.

### 1.

In January 1981, PBGC issued its initial determination advising Roscommon Financial that under 29 U.S.C. § 1362, (1) the plan sponsor and all members of its control group were liable for pension plan underfunding upon plan termination; (2) on the date of plan termination, the Roscommon Group constituted a controlled group with East Dayton as defined under Title IV; and (3) that each company in the Roscommon Group was joint-

ly and severally liable to PBGC for $326,-362.00.

On appeal, disregarding arguments of actual control, PBGC's Appeals Board applied PBGC's 80% control test to the uncontested facts regarding ownership and concluded:

> East Dayton, Roscommon, Dayton, Casting, Advance Foundry, ... and Roscommon Realty were, on the date the Plan terminated, members of a commonly controlled group under ERISA § 4001(b) and therefore constitute the 'employer' that maintained the Plan.

Additionally, the Appeals Board noted Roscommon Financial filed federal income tax returns on its own behalf and on behalf of the members of the Roscommon Group. In the tax returns Roscommon Financial stated it owned 100% of East Dayton's stock. The tax returns also indicated Roscommon Financial and East Dayton constituted a controlled group under the Federal Tax Code, and therefore, was entitled to approximately $2 million in tax deductions.

The district court, however, decided as a matter of law, *Challenge Stamping* was the controlling law in this case. In *Challenge Stamping,* this court reasoned that:

> There is no support for a view that Congress' chief intent in employing this test in ERISA was to invade the deepest pocket in a business failure, regardless of its responsibility to "continue funding" a pension plan of a controlled company. The purpose of the 80% regulation is obviously to find the party in *control.* When, by operation of bankruptcy law, a party is actually denied control, there is no reason to apply the regulation.

719 F.2d at 151. This court stated the conclusion in *Challenge Stamping* did not invalidate the 80% control test or establish a per se rule for all bankruptcies. *Id.* Instead, this court merely concluded the "stock did not provide any measure of control over [the corporation] at the date of termination, and thus, the regulation did not apply." *Id.* The district court opined that this case fell directly within the parameters of *Challenge Stamping's* facts stating:

> The allegation that [*Challenge Stamping* ] applies only in bankruptcy contexts is

without merit. In [*Challenge Stamping*], the Sixth Circuit did not limit its pronouncement to bankruptcy scenarios. Rather, the [*Challenge Stamping*] court looked to the totality of the circumstances surrounding corporate operations and actual control over the owned company or over the pension plan to determine whether or not the 80% stock ownership rule accurately defined the party with a controlling interest. In this Court's opinion, the means by which corporate control is lost is not relevant. Regardless of the means that effectuate the loss of control, the same result is achieved—the loss of control over the company operations and the pension plan. Thus, whether a company is stripped of its control by a bankruptcy court or by a secured creditor, as in this case, is insignificant; it is a distinction without a difference.

■ We review district court conclusions of law *de novo. Feldpausch v. Heckler,* 763 F.2d 229, 230 (6th Cir.1985). After a de novo review of the record, we disagree with the district court's conclusion *Challenge Stamping* controls the instant case. In *Challenge Stamping,* a bankruptcy case, the stock purchaser *never* had actual control over the company involved or over its pension plan. Here, Roscommon Financial actually controlled East Dayton and its Plan for two and a half years. In applying *Challenge Stamping,* the district court ignored the purposes of ERISA by not imposing liability on Roscommon Financial and its controlled group for East Dayton's unfunded benefit liabilities. Because the Roscommon Group controlled East Dayton and its Plan for over two and a half years, *Challenge Stamping's* reasoning is inapplicable. Thus, the district court erred in not applying ERISA's brightline 80% control test.

### 2.

■ Under ERISA, when a single employer pension plan is terminated, an employer is liable for the total amount of unfunded benefit liabilities on the plan termination date. 29 U.S.C. § 1362(a) (Supp.1993). ERISA provides "all ... trades or businesses ... under

common control shall be treated as ... a single employer." 29 U.S.C. § 1301(b)(1). Pursuant to the statute, the PBGC defined "common control" as "one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest...." 26 C.F.R. § 11.414(c)–2(b)(1). PBGC further defined a controlling interest in the case of a corporation as:

> ownership of stock possessing at least 80 percent of the total combined voting of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation.

26 C.F.R. § 11.414(c)–2(b)(2)(a).

The parties do not dispute the Roscommon Group entities qualify as businesses under ERISA. Here, the individual Appellees equally owned Roscommon Financial and Roscommon Realty. The parties agreed on the termination date Roscommon Financial owned: (1) 100% of East Dayton stock; (2) 88% of Dayton Casting Company, Inc. stock; and (3) 90% of Advance Foundry Company, Inc. stock. Thus, all the businesses were connected through common ownership. Additionally, because the ownership exceeds 80% of the total value of stock in each business, it qualified as a "controlling" interest under ERISA. Therefore, PBGC's Appeals Board correctly concluded the Roscommon Group was a group of businesses connected through a controlling interest which qualified as an employer under section 1301(b). Consequently, we **REVERSE** the district court's judgment and find the members of the Roscommon Group are jointly and severally liable for East Dayton's unfunded benefit liabilities.

### B.

PBGC argues the district court erred in approving the magistrate's recommendation and granting the individual Appellees' motion to dismiss. Specifically the magistrate found "PBGC has not requested a judgment against Granzow, Sherman and Tormey as individuals, and therefore, a dismissal should be granted to Defendants. The Court also notes that even if a demand is made in the Complaint as against those Defendants, a dismissal would still be in order since their liability, if any, would have to be derivative from the liability if the organizational Defendants and they should be granted summary judgment." We disagree.

We review a district court's grant of a Rule 12(b)(6) motion *de novo.* *Meador v. Cabinet for Human Resources,* 902 F.2d 474, 475 (6th Cir.), *cert. denied,* 498 U.S. 867, 111 S.Ct. 182, 112 L.Ed.2d 145 (1910); *Dana Corp. v. Blue Cross & Blue Shield Mutual,* 900 F.2d 882, 885 (6th Cir.1990). Here, the district court erroneously concluded PBGC's complaint failed to request judgment against the individual Appellees. Rule 54(c) provides "every final judgment shall grant relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleading." Fed. R.Civ.P. 54(c). If a pleading provides a defendant notice of the plaintiff's claims and the grounds for the claims, *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957), omissions in a prayer for relief do not bar redress of meritorious claims. *Holt Civic Club v. Tuscaloosa,* 439 U.S. 60, 66, 99 S.Ct. 383, 387, 58 L.Ed.2d 292 (1978).

The complaint named the partnership Roscommon Realty as a Defendant. Both Ohio law and ERISA provide joint and several liability for partners where partnership debts exist. Ohio Rev.Code Ann. § 1775.-14(B) (Anderson 1992); *see* 46 Fed.Reg. 9520, 9522–23 (Mar. 1, 1981); *Central States, Southeast & Southwest Areas Pension Fund v. Skyland Leasing Co.,* 691 F.Supp. 6 (W.D.Mich.1987), *aff'd mem.,* 892 F.2d 1043 (6th Cir.1990). In its complaint, PBGC explicitly sought recovery for the unfunded benefit liabilities from each of the Roscommon Group members including the partnership Roscommon Realty. The complaint, therefore, provided individual Appellees notice of PBGC's claims and the grounds for those claims. Additionally, PBGC's complaint contained a general prayer for relief "requesting such other legal or equitable relief as may be just and proper." Other legal or equitable relief implicitly includes relief from individual partners where the partnership assets prove insufficient. Thus, we find

PBGC's complaint states a cause of action against the individual Appellees.

■ Before a creditor can seek partners' individual assets, Ohio law requires a specific determination that partnership assets are insufficient to meet partnership debts. *See Wayne Smith Constr. Co. v. Wolman,* 65 Ohio St.3d 383, 391, 604 N.E.2d 157, 163 (1992). That issue, however, is not before us. The determination of the sufficiency of the partnership assets is a finding of fact and is properly determined by the district court. We, therefore, **REVERSE** the district court's grant of individual Appellees' Motion to Dismiss and **REMAND** for reconsideration consistent with this opinion.

### III.

For the reasons stated above, we **REVERSE** and **REMAND.**