[Nos. 44278-3-I; 44382-8-I. Division One. July 24, 2000.]

DAVID A. SABEY, *Appellant*, v. HOWARD JOHNSON & COMPANY, *Respondent*.

*Arthur W. Harrigan, Jr., Matthew R. Kenney*, and *Randall T. Thomsen* (of *Danielson Harrigan & Tollefson*); and *Mark J. Hentschell*, for appellant.

*Paul R. Taylor* and *Paul R. Raskin* (of *Byrnes & Keller, L.L.P.*), for respondent.

ELLINGTON, J. — In 1989, David Sabey was interested in purchasing Frederick & Nelson Acquisition Company (FNAC). At the time, Howard Johnson & Company, an actuarial firm, was assisting FNAC in phasing out its pension plan and replacing it with a 401(k) and profit-sharing plan. Howard Johnson communicated orally and in writing with Sabey's personal counsel about the adequacy of FNAC's pension plan funding and its compliance with the Employee Retirement Income Security Act (ERISA). Sabey allegedly relied on those representations, and formed a company, F&N Holding, Inc., which purchased FNAC. Eventually, the Pension Benefits Guaranty Corporation (PBGC) determined the plan was underfunded in violation of ERISA, and notified Sabey that he and Sabey Corporation were liable for a shortfall of $3.75 million. Sabey settled with the PBGC and brought this action against Howard Johnson, seeking reimbursement on theories of negligence, negligent misrepresentation, and indemnification. The trial court dismissed all claims on summary judgment.

Considering the evidence in the light most favorable to Sabey, we hold that he has standing to seek reimbursement from Howard Johnson because he incurred personal liability under ERISA, his claims are not remote because they are based on representations made to him personally, and his common law indemnification claim is not barred by the

tort reform act. Finally, we hold his claims are not time barred. Accordingly, we reverse.

## FACTS[1]

In 1986, FNAC hired Howard Johnson, an actuarial firm, to assist in terminating its pension plan and substituting 401(k) and profit-sharing plans.

In the fall of 1988, FNAC began formal termination of the pension plan as required under ERISA.[2] In October, as FNAC's representative, Howard Johnson certified to the PBGC that "the value of the [FNAC's] plan's assets . . . equals or exceeds the value of the plan's benefit liabilities." In October and November 1988, FNAC notified plan participants of the imminent termination of the plan and the benefits to be received by each participant, and requested the participants notify FNAC if they were interested in receiving lump sum payments.

Based on Howard Johnson's advice, FNAC reported in its financial statements that the pension plan was underfunded by approximately $150,000.

In February 1989, David Sabey's personal counsel began conducting due diligence for Sabey's decision about the potential purchase of FNAC. At that time, Sabey's representatives reviewed FNAC's financial statements, met with FNAC management, and secured oral and written advice from Howard Johnson regarding the FNAC pension plan.

Sabey was aware that the plan was being terminated and that Howard Johnson was acting as the actuarial consultant for the purpose of determining whether ERISA's termination requirements were met. As a result of Howard Johnson's assurances to FNAC and Sabey's personal counsel, Sabey believed plan assets were sufficient to complete the termination with no significant deficiency. Sabey's com-

---

[1] This matter was decided on summary judgment. We recite the facts in the light most favorable to Sabey.

[2] 29 U.S.C. §§ 1001-1461.

pany, F&N Holding, Inc., purchased FNAC on July 11, 1989.

Meanwhile, in spring of 1989, Howard Johnson urged FNAC to make lump sum payments to plan members. FNAC expressed concern about doing so. Howard Johnson repeatedly assured FNAC that there were sufficient funds available to pay lump sum distributions, purchase members' annuities, and pay other expenses. FNAC made the lump sum distributions before receiving formal annuity bids. Howard Johnson began soliciting annuity bids in late spring of 1989. All the bids were $1.4 million or more above plan assets. On September 7, 1989, Howard Johnson informed the PBGC that the plan lacked sufficient assets.

In September 1991, FNAC filed for bankruptcy protection. FNAC and F&N Holding ceased operations and were liquidated. The PBGC paid the affected pension plan members but made no ERISA claims against FNAC.

In 1993, the PBGC began investigating which parties were liable for improper termination and underfunding of the plan. At that time, the PBGC told Sabey that he and Sabey Corporation[3] were being considered as part of the FNAC "controlled group,"[4] and therefore potentially liable to the PBGC. Sabey began negotiating with the PBGC.

That same year, FNAC, Sabey Corporation, and the pension plan itself brought suit against Howard Johnson and others in federal court. David Sabey was not a party. Howard Johnson moved for summary judgment, arguing that the plaintiffs had no claims until the PBGC assigned liability. The motion was never decided. In April 1995, the federal district court dismissed the suit for failure to prosecute. Under the federal local rules, the dismissal was with prejudice, but as to Sabey Corporation, the order was modified to read, "The claims asserted by plaintiff Sabey

---

[3] Sabey was president and sole shareholder of Sabey Corporation.

[4] The significance of the PBGC designation of a "controlled group" is discussed *infra*.

Corporation shall be dismissed without prejudice."[5]

In June 1995, the PBGC advised Sabey's counsel by telephone that in their view, the appropriate termination date for the pension plan would be a date between September 7, 1989 and July 1, 1993. The PBGC's position was confirmed by a letter received July 10, 1995. The PBGC asserted that Sabey and his affiliated companies were liable for the underfunding of the pension plan in the amount of $1.75 million to $3.72 million, depending on the termination date.

In February 1997, the PBGC formally notified Sabey that it would seek, under ERISA, to establish his and Sabey Corporation's liability in the amount of $3.75 million. In March 1998, Sabey agreed to pay $1.95 million to settle the claim, securing his and Sabey Corporation's release from liability.

Sabey paid the PBGC in August 1998, and brought negligence, negligent misrepresentation, and indemnification claims against Howard Johnson, seeking reimbursement of his settlement with the PBGC. Howard Johnson moved for summary judgment, arguing that Sabey lacked standing, his claims were too remote, his indemnity claim was abolished by the tort reform act, and his claims were time barred. The trial court granted Howard Johnson's motion and dismissed all of Sabey's claims.[6]

## DISCUSSION

 When reviewing an order on summary judgment,

---

[5] The court explained, "It is apparent that, up to now, Sabey [Corp.] could not have known and, indeed, still does not know whether it might be held responsible for problems with the Frederick & Nelson pension plan. Until the Pension Benefit Guaranty Corporation makes a final determination on this matter, Sabey will not be able to decide whether it should pursue a lawsuit for indemnity against defendant Howard Johnson. An order dismissing this action with prejudice would deprive Sabey of its day in court even though Sabey has never had an opportunity to present its case on the merits."

[6] The order granting summary judgment in favor of Howard Johnson does not provide the basis for the court's decision. Sabey's motion for reconsideration suggests, however, that the court granted the motion on both standing and statute of limitation grounds.

the facts and law are reviewed de novo.[7] Facts and all reasonable inferences from the facts are considered in the light most favorable to the nonmoving party.[8] Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.[9]

Preliminary Discussion: ERISA Termination Liability

Because Sabey's personal liability to the PBGC derives from his inclusion in the "controlled group" held responsible under ERISA for improper termination and underfunding of the FNAC's pension plan, a brief discussion of ERISA is necessary.

Congress enacted ERISA "to ensure that employees and their beneficiaries would not be deprived of anticipated retirement benefits by the termination of pension plans before sufficient funds had been accumulated in the plans."[10] ERISA's Title IV created a mandatory insurance program covering guaranteed benefits in the event pension plans terminate with insufficient funds.[11]

The PBGC administers this insurance program.[12] When a plan terminates without sufficient funds to pay vested benefits, the PBGC pays those benefits to the affected employees.[13] Where a single employer pension plan is terminated, an employer is liable for the total amount of unfunded benefit liabilities on the plan termination date.[14] The PBGC and the plan administrator issue a mutually

---

[7] *Schaaf v. Highfield*, 127 Wn.2d 17, 21, 896 P.2d 665 (1995).

[8] *Id.*, 127 Wn.2d at 21.

[9] *See* CR 56(c).

[10] *Teamsters Pension Trust Fund v. Cristinzio*, 994 F. Supp. 617, 621 (E.D. Pa. 1998).

[11] *Id.* at 621.

[12] *Id.*

[13] *Pension Benefit Guar. Corp. v. Ouimet Corp.*, 630 F.2d 4, 9 (1st Cir. 1980).

[14] *Pension Benefit Guar. Corp. v. East Dayton Tool & Die Co.*, 14 F.3d 1122, 1126 (6th Cir. 1994) (citing 29 U.S.C. § 1362(a) (Supp. 1993)).

acceptable date for plan termination,[15] so where ownership changes occur close in time to the plan termination, liability to PBGC is unclear until the date is set.

ERISA provides that "all . . . trades or businesses . . . under common control shall be treated as . . . a single employer."[16] "Common control" is determined under Treasury regulations, which are made applicable to pension cases by the PBGC's regulations.[17] "Common control" is "one or more chains of organizations conducting trades or businesses connected through ownership of a controlling interest."[18] In the case of a corporation, a controlling interest is "ownership of stock possessing at least 80 percent of total combined voting of all classes of stock entitled to vote of such corporation or at least 80 percent of the total value of shares of all classes of stock of such corporation."[19] More generally, a common control group will be found where:

> (1) corporations are affiliated through overlapping 80 percent ownership (parent-subsidiary); (2) two entities belong to a brother-sister group, that is, five or fewer persons own a controlling interest (80 percent) in each organization and exercise effective control (50 percent identical ownership) over both; or (3) a combined group of three or more corporations that are members of either a parent-sub or brother-sister group and one of which is a common parent and a brother corporation.[20]

This is the so-called "controlled group." Members of the "controlled group" are jointly and severally liable to the PBGC.[21]

---

[15] 29 U.S.C. § 1348.

[16] *Id.* § 1301(b)(1).

[17] *See* 29 C.F.R. § 4001.3.

[18] *East Dayton Tool,* 14 F.3d at 1127 (citing 26 C.F.R. § 11.414(c)-2(b)(1)).

[19] *Id.* (citing 26 C.F.R. § 11.414(c)-2(b)(2)(a)).

[20] John J. Kalas, *Termination Liability for Single Employer Pension Plans: What Lenders Need to Know,* 112 Banking L.J. 24, 29 (1995) (citing 26 C.F.R. §§ 11.414(c)-2(c)(1), 11.414(d)).

[21] 29 U.S.C. § 1362(a).

In summary, the PBGC apparently pursued Sabey and Sabey Corporation because on the FNAC plan termination date asserted by the PBGC, Sabey had ownership interests in F&N Holding and in Sabey Corporation such that both he and Sabey Corporation fell within the "controlled group" definition.[22]

Standing

■ The standing doctrine requires that a plaintiff must have a personal stake in the outcome of the case in order to bring suit.[23] Ordinarily, a shareholder cannot sue for wrongs done to a corporation, because the corporation is a separate entity: the shareholder's interest is viewed as too removed to meet the standing requirements.[24] Even a shareholder who owns all or most of the stock, but who suffers damages only indirectly as a shareholder, cannot sue as an individual.[25] Howard Johnson argues that Sabey was merely a shareholder in F&N Holding and therefore lacks standing.

■■ There are two often overlapping exceptions to the general rule: (1) where there is a special duty, such as a contractual duty, between the wrongdoer and the shareholder; and (2) where the shareholder suffered an injury

---

[22] The record contains no documents from the PBGC other than the settlement agreement between it, Sabey, and Sabey Corporation. The record does not establish what, if any, interest Sabey Corporation may have held in F&N Holding, and the record does not reveal the precise basis for the PBGC's determination of liability.

Personal liability under ERISA is a complex subject. *See, e.g.*, Diana M. Muir & Cindy A. Schipani, *The Intersection of State Corporation Law and Employee Compensation Programs: Is It Curtains for Veil Piercing?*, 1996 U. ILL. L. REV. 1059, 1101 ("To an even greater degree than other federal statutes such as CERCLA, ERISA's myriad regulatory requirements provide a number of potential settings where a variety of parties may attempt to reach through the curtain of protection typically accorded to corporations."); Wilson McLeod, *Shareholders' Liability and Workers' Rights: Piercing the Corporate Veil Under Federal Labor Law*, 9 HOFSTRA LAB. L.J. 115, 167 (1991).

[23] *Gustafson v. Gustafson*, 47 Wn. App. 272, 276, 734 P.2d 949 (1987).

[24] *Id.* at 276.

[25] 12B WILLIAM MEADE FLETCHER, ET AL., FLETCHER CYCLOPEDIA OF THE LAW OF PRIVATE CORPORATIONS § 5910 (perm. ed. rev. vol. 1993).

separate and distinct from that suffered by other share-holders.[26] Sabey asserts both exceptions here.

As to the existence of a special duty, Howard Johnson points out that it was not in contractual privity with Sabey. While this is true, it is not dispositive. The special duty need not arise from a contract. The question is whether a duty was owed to the individual independent of his status as a shareholder:

> As an exception to the general rule, a stockholder may maintain an action in his own right against a third party (although the corporation may likewise have a cause of action for the same wrong) when the injury to the individual resulted from the violation of some special duty owed to the stockholder but only when that special duty had its origin in circumstances independent of the stockholder's status as a stockholder.[27]

Sabey's claim is for negligent misrepresentation. The RESTATEMENT (SECOND) OF TORTS § 552 (1977) provides in relevant part:[28]

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>
> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

---

[26] *Id.* § 5911.

[27] *Hunter v. Knight, Vale & Gregory*, 18 Wn. App. 640, 646, 571 P.2d 212 (1977) (emphasis omitted).

[28] Although Washington courts have not directly adopted section 552, it has been cited with approval numerous times. *See Schaaf*, 127 Wn.2d at 22 (discussing Washington case law that relies on section 552).

Approximately one month before Sabey formed the corporation that would buy FNAC, during Sabey's due diligence process, Howard Johnson advised Sabey's personal counsel as follows:

> For 1988, the plan was fully funded as defined by the Internal Revenue Service for purposes of minimum funding.
>
> However, based on the current PBGC interest assumptions, the assets are insufficient to cover the lump-sum cash value of each participant's benefit. The amount of deficiency will vary as the Pension Benefit Guaranty Corporation assumptions change. As an educated guess, the deficiency, based on current PBGC assumptions is in the range of $200,000-$350,000. . . .
>
> We are currently in the process of obtaining bids for those benefits which have been promised in the form of an annuity. It is anticipated that the plan can be successfully terminated in 1989.

The purpose of the letter was to confirm previous discussions between Howard Johnson and Sabey's personal counsel. Under the RESTATEMENT, this representation, and those that preceded it, could be found to create (and breach) a duty to Sabey personally.

As to the second exception to the shareholder standing rule, Sabey alleges individual injury. When Sabey was identified as member of the controlled group and paid $1.95 million to the PBGC in exchange for release of his and Sabey Corporation's liability, he suffered an injury separate and distinct from that of other shareholders. Thus, both exceptions to the shareholder standing rule are applicable, and the rule does not preclude Sabey's standing.

In a related argument, Howard Johnson also asserts that Sabey lacks standing because he was merely a statutory guarantor of FNAC's pension obligations. Howard Johnson relies on several cases involving shareholders' personal guaranties of corporate debt. But the cases are unhelpful because each involves shareholders' guaranties grounded in contract, not an obligation grounded in statute.[29]

---

[29] *See Sparling v. Hoffman Constr. Co.*, 864 F.2d 635 (9th Cir. 1988); *Adair v.*

Howard Johnson cites no authority, and we find none, for the proposition that under ERISA, shareholders in the "controlled group" are considered statutory guarantors of corporate debt, or that such liability would be equivalent to a personal guaranty.

We hold that despite Sabey's status as sole shareholder in F&N Holding, he has standing to seek reimbursement from Howard Johnson because he alleges a personal relationship that may create a duty in Howard Johnson under the RESTATEMENT, misrepresentations made to him personally that may constitute a breach of that duty, and a separate and distinct injury, i.e., personal liability under ERISA.

Remoteness

Howard Johnson argues the remoteness doctrine bars Sabey's action because his claims are four times removed: Howard Johnson allegedly negligently advised FNAC regarding the pension plan, FNAC was damaged by the negligence, F&N Holding was damaged when it purchased FNAC because FNAC could not satisfy its pension obligations, and Sabey was damaged because, as a controlling shareholder in F&N Holding, he was required to cover FNAC's liability.[30] Sabey responds his claims are not remote because they are based on his personal reliance on Howard Johnson's representations to him.

 Only a limited class of plaintiffs may bring negligent misrepresentation claims based on section 552 of the RE-

*Wozniak*, 22 Ohio St. 3d 174, 492 N.E.2d 426 (1986); *Numerica Sav. Bank, F.S.B. v. Mountain Lodge Inn, Corp.*, 134 N.H. 505, 596 A.2d 131 (1991); *Nicholson v. Ash*, 800 P.2d 1352 (Colo. Ct. App. 1990).

[30] *See Associated Gen. Contractors of Cal., Inc v. California State Council of Carpenters*, 459 U.S. 519, 103 S. Ct. 897, 74 L. Ed. 2d 723 (1983); *see also Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 112 S. Ct. 1311, 117 L. Ed. 2d 532 (1992); *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 185 F.3d 957 (9th Cir. 1999), *cert. denied*, 120 S. Ct. 789 (2000); *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912 (3d Cir. 1999), *cert. denied*, 120 S. Ct. 844 (2000); *Oregon Laborers-Employers Health & Welfare Trust Fund v. Philip Morris, Inc.*, 17 F. Supp. 2d 1170 (D. Or. 1998), *cert. denied*, 120 S. Ct. 789 (2000); *Forcum-James Co. v. Duke Transp. Co.*, 231 La. 953, 93 So. 2d 228 (1957); *Rockaway Boulevard Wrecking & Lumber Co. v. Raylite Elec. Corp.*, 26 A.D.2d 9, 269 N.Y.S.2d 926 (1966).

STATEMENT (SECOND) OF TORTS.[31] "One of the requirements for recovery under that section is that the loss be suffered by the 'person or one of the limited group of persons for whose benefit and guidance [the defendant] intends to supply the information or knows that the recipient intends to supply it.' "[32] Here, Sabey alleges Howard Johnson advised him personally as to the pension plan's funding. Whether Sabey falls in the class of persons for whose benefit and guidance Howard Johnson intended to supply information is a question of fact. But his claim is direct, not derivative, and is therefore not remote.

## Common Law Indemnity after the Tort Reform Act

██ Indemnity sounds either in contract or in tort, and it is a distinct and separate equitable cause of action.[33] " 'Indemnity requires full reimbursement and transfers liability from the one who has been compelled to pay damages to another who should bear the entire loss.' "[34]

Howard Johnson argues that the 1981 Product Liability and Tort Reform Act[35] (Tort Reform Act) abolished all common law indemnity rights except those founded in contract, and that Sabey's claim was therefore properly dismissed. Sabey acknowledges his indemnity right is grounded in tort, and denies it was abolished by the Tort Reform Act. Sabey is correct. Howard Johnson's argument is not supported by the language of the Tort Reform Act, its legislative history, rules of statutory construction, or case law.

██ The Tort Reform Act provides, "The common law right of indemnity between active and passive tort feasors is abolished: *Provided*, That the common law right of

---

[31] *Schaaf*, 127 Wn.2d at 26.

[32] *Id.* at 25 (quoting RESTATEMENT (SECOND) OF TORTS § 552(2)(a)).

[33] *Central Wash. Refrigeration v. Barbee*, 133 Wn.2d 509, 513, 946 P.2d 760 (1997).

[34] *Id.*, 133 Wn.2d at 513 (quoting *Stevens v. Security Pac. Mortgage Corp.*, 53 Wn. App. 507, 517, 768 P.2d 1007 (1989)).

[35] LAWS OF 1981, ch. 27 (codified in chapters 7.72 and 4.22 RCW).

indemnity between active and passive tort feasors is not abolished in those cases to which a right of contribution by virtue of RCW 4.22.920(2) does not apply."[36] The Tort Reform Act also created a right of contribution between persons who are "jointly and severally liable upon the same indivisible claim for the same injury, death or harm."[37]

In abolishing indemnity rights between joint tortfeasors, the Legislature intended such rights would be replaced with contribution rights. As the court observed in *Johnson v. Continental West, Inc.*,[38] "the intended purpose was to simply substitute the right of contribution for the right of common law indemnity." The *Johnson* court considered the Tort Reform Act, its 1982 amendment (Senate Bill 4691, which preserved indemnity rights of joint tortfeasors who were ineligible to claim contribution because their cases had settled prior to the 1981 effective date of the Tort Reform Act[39]), and the legislative history, noting that the Act's chief drafter had written that common law indemnity applied where the right of contribution is not allowed.[40] The court agreed:

[A] review of the act itself as well as the act's historical background and subsequent legislative action discloses that the intended purpose was to simply substitute the right of contribution for the right of common law indemnity. Consequently, it is not logical to assume it was the Legislature's

---

[36] RCW 4.22.040(3). RCW 4.22.920 provides:

(1) Chapter 27, Laws of 1981 apply to all claims arising on or after July 26, 1981.

(2) Notwithstanding subsection (1) of this section, RCW 4.22.040, 4.22.050, and 4.22.060 shall also apply to all actions in which trial on the underlying action has not taken place prior to July 26, 1981, except that there is no right of contribution in favor of or against any party who has, prior to July 26, 1981, entered into a release, covenant not to sue, covenant not to enforce judgment, or similar agreement with the claimant.

[37] RCW 4.22.040(1).

[38] *Johnson v. Continental W., Inc.*, 99 Wn.2d 555, 560, 663 P.2d 482 (1983).

[39] *Johnson*, 99 Wn.2d at 561-62 (citing FINAL LEGISLATIVE REPORT, at 185 (1982)).

[40] *Id.* at 560.

intent that one would be denied *both* the right of contribution and a common law right of indemnity.[41]

In *Glover v. Tacoma General Hospital*, the Washington Supreme Court also noted that when RCW 4.22.040 and RCW 4.22.060 (regarding the effect of settlement agreements) are read together, they "form a comprehensive statutory scheme designed to allocate financial responsibility between defendants."[42]

The *Glover* court's observations relate equally to the broader statutory scheme, which also indicates that substitution of indemnity rights with contribution rights is limited to joint tortfeasors. Until 1981, Washington followed the common law rule against contribution between joint tortfeasors, which was premised on notions of "indivisibility of harm" and the conceptual difficulties of allocating fault between joint tortfeasors.[43] The rule had been falling into disfavor throughout the country and, in 1981, the Legislature created a statutory right to contribution among joint tortfeasors.[44] Contribution is "conditioned on the existence of joint and several liability because absent such common joint and several liability one party will have no duty to pay another's liability for damages and, thus, no cause for subsequent reimbursement."[45] With the enactment of the Tort Reform Act of 1986, the Legislature abolished joint and several liability in most circumstances in favor of proportionate liability.[46]

The Tort Reform Act thus abolishes common law indem-

---

[41] *Id.*

[42] *Glover v. Tacoma Gen. Hosp.*, 98 Wn.2d 708, 724, 658 P.2d 1230 (1983), *overruled on other grounds by Crown Controls, Inc. v. Smiley*, 110 Wn.2d 695, 756 P.2d 717 (1988).

[43] *See Kottler v. State*, 136 Wn.2d 437, 441, 963 P.2d 834 (1998). Where the parties are not joint tortfeasors, difficulties of allocating fault are, of course, not present.

[44] *Id.* at 441 (citing LAWS OF 1981, ch. 27, §§ 12-14 (codified at RCW 4.22.040-.060)).

[45] *Id.* at 442.

[46] *Id.* at 443 (citing LAWS OF 1986, ch. 305).

nity rights only between joint tortfeasors, and indeed only between joint tortfeasors with a right of contribution. Howard Johnson makes no claim that Sabey is a tortfeasor, and certainly Sabey is not a joint tortfeasor with Howard Johnson as to the PBGC. Howard Johnson's argument thus finds no support in statutory language or statutory history.

 ██ Rules of statutory construction also confirm the continuing existence of tort-based indemnity claims between non-joint tortfeasors. "[T]he Legislature is presumed to know the existing state of the case law in those areas in which it is legislating and a statute will not be construed in derogation of the common law unless the Legislature has clearly expressed its intention to vary it."[47] The language of RCW 4.22.040 contains no expression of intent to abolish tort-based indemnity claims between non-joint tortfeasors. In the absence of such an expression, the common law rule prevails.

At least one post-Tort Reform Act case demonstrates that tort-based indemnity actions between non-joint tortfeasors survived passage of the Tort Reform Act. In *Radach v. Gunderson*,[48] the City of Ocean Shores negligently permitted the Gundersons to build their home too close to the ocean, in violation of the zoning code. The Gundersons' neighbors, the Radachs, sued the Gundersons and the City, seeking injunctive relief. The Gundersons crossclaimed for indemnity against the City. The court held the Radachs were entitled to an injunction, and that the City owed a duty to the Gundersons.[49] The court remanded for an injunction requiring the Gundersons to move their house, and for judgment against the City for the entire expense.[50] In doing so, the court stated:

> Were this purely an action at law, there is no doubt at all that the Gundersons would be entitled to indemnity from the City

---

[47] *Price v. Kitsap Transit*, 125 Wn.2d 456, 463, 886 P.2d 556 (1994).

[48] *Radach v. Gunderson*, 39 Wn. App. 392, 695 P.2d 128 (1985).

[49] *Radach*, 39 Wn. App. at 397.

[50] *Id.* at 401.

for any relief granted against them. Only a duty running from the City to the Gundersons would be necessary to support this result. We see no reason why the same principles should not apply in equity.[51]

In a footnote, the court added, "In view of the Gundersons' 'innocence' as found by the trial court, this result would not be changed by RCW 4.22.040 (right of contribution among tortfeasors; common law indemnity abolished)."[52]

The authorities upon which Howard Johnson relies are not to the contrary, but rather either confirm the Legislature's abolition of common law indemnity rights between joint tortfeasors, or involve contribution rights.[53] Thus, Howard Johnson's argument also finds no support in rules of statutory construction or case law.

Where a legal duty exists between non-joint tortfeasors, an indemnity right exists at common law. This right is not affected by the Tort Reform Act. Sabey's indemnity claim is not barred by the statute.

Statute of Limitations

Sabey's claims for negligence and negligent misrepresentation are subject to three-year statutes of limitations.[54] The statute does not begin to run until the cause of action accrues—that is, when the plaintiff has a right to

---

[51] *Id.* at 398 (citations omitted).

[52] *Id.* at 398 n.5.

[53] *See Kottler v. State*, 136 Wn.2d 437, 449, 963 P.2d 834 (1998) (settling party has no contribution right against another alleged tortfeasor because there is no joint and several liability); *All-Pure Chem. Co. v. White*, 127 Wn.2d 1, 16, 896 P.2d 697 (1995) (federal Insecticide, Fungicide, and Rodenticide Act preempted state tort claim, resulting in no joint liability); 16 David K. DeWolf & Keller W. Allen, Washington Practice: Tort Law and Practice § 6.70, at 173 (1993) ("Prior to the Tort Reform Act, before contribution was available as a general remedy, indemnity was permitted between active and passive tortfeasors. This right was abolished as part of the Tort Reform Act of 1981."); DeWolf, *supra*, § 6.62, at 168-69 ("In order to have a right to obtain contribution from an entity, the party seeking contribution must be held jointly and severally liable with the party against whom contribution is sought.").

[54] RCW 4.16.080(2); RCW 4.16.080(4); *Davidheiser v. Pierce County*, 92 Wn. App. 146, 156 n.5, 960 P.2d 998 (1998), *review denied*, 137 Wn.2d 1016 (1999).

seek relief in the courts.[55] Injury is one of the elements of a cause of action for negligence.[56] In the case of negligent misrepresentation, the plaintiff must also have discovered (or, in the exercise of due diligence, should have discovered) the misrepresentation.[57]

An indemnity action accrues, on the other hand, when the party seeking indemnity pays or "is legally adjudged obligated to pay" damages to a third party.[58]

The question here is when Sabey was damaged. Howard Johnson argues that if Sabey was personally harmed, the harm occurred when his company, F&N Holding, acquired FNAC in July 1989.[59] We disagree. First, this argument disregards the corporate entity and Howard Johnson suggests no reason to do so. Second, at that time, due to Howard Johnson's assurances, Sabey understood that FNAC was not significantly underfunded, and so had not discovered the misrepresentation. Third, any actual damage sustained then was incurred by F&N Holding, not by Sabey personally.

The underfunding of the plan was known in September 1989. But not until June 1995 did the PBGC notify Sabey that, based on a likely plan termination date between September 7, 1989 and July 1, 1993, Sabey and his affiliated companies were part of the controlled group, and potentially liable for $1.75 to $3.72 million (plus interest). Not until February 1997 did the PBGC officially notify Sabey that it would seek to recover $3.75 million from him personally and from Sabey Corporation. In March 1998,

[55] *Colwell v. Eising*, 118 Wn.2d 861, 868, 827 P.2d 1005 (1992).

[56] *See, e.g., Gevaart v. Metco Constr., Inc.*, 111 Wn.2d 499, 501, 760 P.2d 348 (1988).

[57] *First Md. Leasecorp v. Rothstein*, 72 Wn. App. 278, 282, 864 P.2d 17 (1993).

[58] *Central Wash. Refrigeration v. Barbee*, 133 Wn.2d 509, 517, 946 P.2d 760 (1997).

[59] Sabey argues that the federal court's 1995 ruling, in which the claims were dismissed without prejudice, estops Howard Johnson from claiming Sabey's claims are time-barred. Sabey was not party to that litigation, however, and his injury is different from injuries alleged by FNAC, F&N Holding, and Sabey Corporation.

Sabey agreed to pay to the PBGC $1.95 million to release himself and Sabey Corporation from liability. In August 1998, the funds were paid and Sabey filed this suit against Howard Johnson.

Howard Johnson has not established that Sabey's negligence claims accrued earlier than March 1998 when he agreed to pay the PBGC. As to the indemnification action, neither party specifies which statute of limitation applies, but Sabey's indemnification action accrued when he paid the PBGC in August 1998, and so would be timely under any statute.

Howard Johnson relies on *Green v. A.P.C.*[60] and *Hamilton v. Arriola Bros. Custom Farming.*[61] But the court in *Green* just rejected application of the "two-injury" rule (i.e., a separate statutory period applies to each separate and distinct injury regardless of number)[62] in the absence of testimony that Green's medical problems were separate and distinct consequences of Green's original injury.[63] In *Hamilton*, the court affirmed summary judgment based on the statute of limitations because Hamilton's claim of increasing damage after the limitation period did not change the legal significance of his prior knowledge of the underlying facts of the claim.[64] Neither *Green* nor *Hamilton* has any bearing here.

Finally, Howard Johnson argues Sabey conceded his injury occurred in 1989 when he stated in his complaint in this action: "Had Mr. Sabey known of the underfunding and of the potential termination problems resulting therefrom, he would have notified the Sellers and obtained indemnity from, or compensation for, this potential liability prior to

---

[60] *Green v. A.P.C.*, 136 Wn.2d 87, 960 P.2d 912 (1998).

[61] *Hamilton v. Arriola Bros. Custom Farming*, 85 Wn. App. 207, 931 P.2d 925 (1997).

[62] *Green*, 136 Wn.2d at 97.

[63] *Id.* at 98.

[64] *Hamilton*, 85 Wn. App. at 212.

closing."[65] This argument lacks merit because it ignores two facts: first, that FNAC was purchased by F&N Holding, not by Sabey personally; second, and more important, knowledge of potential liability is not the equivalent of actual harm. F&N Holding purchased FNAC, and any damages related to underfunding of the plan were originally borne by the company, not Sabey. At that time, Sabey's personal liability was purely speculative—as Howard Johnson acknowledged in federal court in its motion to dismiss on grounds that plaintiffs had no claims until the PBGC assigned liability, and as the federal district court recognized when it dismissed Sabey's claim without prejudice. Sabey's claims are not time-barred.

## CONCLUSION

Summary judgment is reversed. We remand for further proceedings consistent with this opinion.

BAKER and KENNEDY, JJ., concur.

---

[65] Howard Johnson alleges Sabey made the same allegation in 1990 when FNAC, F&N Holding, and Sabey sued the sellers of FNAC in superior court, alleging various causes of action, including breach of contract, misrepresentation of assets, and securities fraud. One allegation was that "[t]he cost of terminating the Frederick & Nelson Pension Plan was not properly accrued on the financial statements upon which the plaintiffs relied." According to briefs in this appeal, the suit was settled in 1992. The record contains nothing further regarding this litigation.